VANCE RIDER
*In propria persona*

c/o RICHARD SUCH
Attorney at Law
1120 College Ave. (upper)
Palo Alto, CA 94306
(415) 495-3119

FILED

JAN 1 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

**(PR)**
**RMW**

VANCE RIDER,

          Petitioner

**CV 08** No. **0235**

                    -vs-

BEN CURRY, Warden, Correctional
Training Facility, Soledad, California

PETITION FOR A WRIT
OF HABEAS CORPUS

                    Respondent

_____/

**PETITION FOR A WRIT OF HABEAS CORPUS**

Petitioner, VANCE RIDER, alleges:

A. **Information about Conviction and Sentence**

     1. Petitioner is challenging the following sentence:

          (a) The judgment of the California Superior Court for the <u>County of</u>

<u>San Mateo</u>;

1

ORIGINAL

(b) in Case No. SC047362;

(c) entered on February 21, 2002, for a total term of 25 years to life under the "Three Strikes and You're Out" law (Cal. Pen. Code, § 1170.12);

(d) which petitioner is now serving in the California Correctional Training Facility , Soledad, California.

2.  Petitioner was given this sentence for the following crime: Failing to register as a sex offender (Cal. Pen. Code, § 290.)

3.  Petitioner was arraigned and had a preliminary hearing.

4.  Petitioner pleaded not guilty.

5.  Petitioner had a jury trial of the charge of violating section 290 and a court trial of the charge of having a prior "strike" conviction.

6.  Petitioner did not testify or present any defense at his trial because the court excluded the testimony of an expert witness as to the absence of the elements of knowledge and intent..

7.  Petitioner had court-appointed attorneys at all proceedings from arraignment through and including appeal;

8.  Petitioner appealed his conviction in a timely manner

(a) to the California Court of Appeal, First Appellate District, Division Four, Case No. A097996, which, on September 13, 2003,

2

December 9, 2005, and June 28, 2006, <u>affirmed the convictions</u>, by Opinions (the reasons for the three opinions will be explained in the accompanying Memorandum of Points and Authorities), the latest of which is attached hereto as Exhibit A,* and to the <u>California Supreme Court</u>, Nos S120014, S140474, and S145664, which twice granted review and remanded to the Court of Appeal and then, on October 18, 2006, denied a Petition for Review. A copy of the order of the Supreme Court denying review is attached hereto as Exhibit B.

(b) The grounds on which petitioner appealed the convictions were <u>the same</u> as those he is raising in this petition.

9. (a) Petitioner has not previously filed a petition for post-conviction relief.

(b) No other petition, appeal, or other post-conviction proceeding is now pending in any court.

**B.  Grounds for Relief**

Petitioner alleges here only the general nature of the grounds for relief. He is attaching hereto a Memorandum of Points and Authorities in which he gives a more complete statement of the supporting facts and some legal authority, and he incorporates the Memorandum herein by reference.

---

* The numbers handwritten in the margins indicate whether the adjacent language was part of the opinion of September 13, 2003 (# 1), new language of the opinion of December 9, 2005 (# 2), or new language of the opinion of June 28, 2006 (# 3).

**Claim 1**: PETITIONER WAS DENIED HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION TO THE DUE PROCESS OF LAW, TO PRESENT A DEFENSE, TO CALL WITNESSES IN HIS OWN BEHALF, TO PRESENT ALL RELEVANT EVIDENCE, AND TO A JURY TRIAL, WHERE THE TRIAL COURT TOTALLY EXCLUDED EXPERT OPINION EVIDENCE AS TO HIS LIMITED INTELLIGENCE AND ABILITY TO REMEMBER HIS DUTY TO REGISTER AS A SEX OFFENDER.

**Claim 2**: PETITIONER WAS DENIED HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION TO DUE PROCESS AND TO A JURY TRIAL BY THE COURT'S INSTRUCTION THAT, IF HE HAD KNOWLEDGE OF THE DUTY TO REGISTER, THEN HIS FAILURE TO REGISTER WAS WILLFUL, WHICH HAD THE EFFECT OF DIRECTING A VERDICT AS TO THE WILLFULNESS ELEMENT AND OPERATED AS A MANDATORY PRESUMPTION.

**Claim 3**: PETITIONER'S RIGHTS UNDER THE UNITED STATES CONSTITUTION TO DUE PROCESS, TO PRESENT A DEFENSE, AND TO A JURY TRIAL WERE VIOLATED BY THE COURT'S INSTRUCTIONS TO THE EFFECT THAT "IGNORANCE OF THE LAW IS NOT AN EXCUSE."

**Claim 4**: THE SENTENCE OF 25 YEARS TO LIFE WAS CRUEL AND UNUSUAL AND DISPROPORTIONATE PUNISHMENT, FORBIDDEN BY

4

THE UNITED STATES CONSTITUTION.

    **WHEREFORE,** petitioner prays that the Court grant petitioner the relief to which he may be entitled in this proceeding.

Dated: January 9th, 2007

VANCE RIDER
Petitioner

5

## VERIFICATION

I, VANCE RIDER, say:

    1.  I am the Petitioner herein.

    2.  I have read the foregoing petition and the allegations thereof are true.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this __th day of January, 2008, at Soledad, California.

VANCE RIDER

6

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF THE CASE

Petitioner Vance Rider, an African-American man born in 1958, was charged by a Second Amended Information No. SC47362A, filed August 6, 2000, with violating "a requirement" of Penal Code section 290[1] between November 23, 1999, and March 13, 2000. He was also charged with prior serious or violent felony convictions under the "Three Strikes" law of (1) violation of Penal Code section 288a, subdivision (c), in 1983, (2) attempted manslaughter (§§ 664 and 192.1 [*sic*]) in 1983, and (3)-(5) three robberies (§ 211) in 1978. He was charged with three prior-prison-term enhancements (§ 667.5) for the 1983 offenses, a 1981 grand theft (§ 487), and a 1978 robbery. (CT 23-28)

On August 6, 2001, the matter was assigned to judge Quentin L. Kopp for jury trial. The allegations of the prior convictions were bifurcated. (CT 141-142)

The jury deliberated for one afternoon and one morning before declaring itself deadlocked. (CT 155-156, 262) On August 14, 2001, after about eight hours

---

[1] In response to petitioner's motion to dismiss under California Penal Code section 995, the prosecution specified that the charge was based on petitioner's alleged "failure to register as a sex offender while residing in San Mateo County at the Armory homeless shelter." (CT 67) The prosecutor argued to the jury, however, two violations: petitioner's failing to "notify" the San Mateo Police Department within five days of moving into the homeless shelter and petitioner's failing to "notify" the department within five days of his birthday, January 4. (RT 190, 191, 193, 197) The former would be a violation of what is now subdivision (a)(1)(A) of section 290 (failure to register), and the latter would be a violation of what is now subdivision (a)(1)(D) of that section (failure annually to update registration).

7

of deliberations, a read-back of testimony, and receiving answers to a number of questions, the jury returned a guilty verdict. (RT 263)

Petitioner then waived a jury trial of the prior-conviction allegations. (RT 264) Trial of those allegations by the court took place on August 15, 2001. The judge found all of the allegations to be true, except the 1978 prior-prison-term. (RT 248, 269-270)

Petitioner moved for a new trial on the ground that the court had erroneously excluded expert opinion evidence on the mental element of the offense. (CT 269-271) The prosecution replied that such evidence was admissible only where the defendant is charged with a specific-intent crime. (CT 273-277) The court appears to have agreed with the prosecutor that such evidence was not admissible in the case of a general-intent crime and denied the motion. (RT 10/5/01, pp. 8-10.)

At the sentencing hearing of February 21, 2002, the court denied a request to strike prior "strike" convictions and sentenced petitioner to a term of 25 years to life. It stayed the prior-prison-term enhancements. (CT 309)

Petitioner appealed in No. A097966 to the Court of Appeal for the First Appellate District, Division Four, which, on September 13, 2003, affirmed the conviction and sentence. Petitioner petitioned the California Supreme Court for review in No. S120014; on December 23, 2003, the Supreme Court granted review

8

and deferred further action pending the decision in another case and, when that case was decided, continued to defer further action pending decision in yet another case; when that case was decided, it transferred the matter back to the Court of Appeal on September 28, 2006, with directions to reconsider its decision in the light of People v. Barker (2004) 35 Cal.4th 345 and People v. Sorden (2005) 36 Cal.4th 65.

The Court of Appeal purported to reconsider the decision and, on December 9, 2005, in an opinion by a different Justice, who had not been present at the original oral argument, re-issued essentially the same opinion, again affirming the judgment. Petitioner petitioned again for review in No. S140474. On March 29, 2006, the Supreme Court again granted review and transferred the matter back to the Court of Appeal with directions to vacate its opinion and issue a decision that considers whether the previous opinion was issued by a properly constituted panel, citing California Constitution, article VI, section 3.

The Court of Appeal held a new oral argument before two Justices who had not been present at the original oral argument and considered the issue of whether the previous panel had been properly constituted to be moot. On June 28, 2006, it issued a new opinion (Exhibit A), which was largely the same as the previous two opinions, again affirming the judgment. Petitioner petitioned again for review in No. 145664, which was denied on October 18, 2006 (Exhibit B).

9

## STATEMENT OF THE FACTS

### 1. Facts of the Offense

The parties stipulated that petitioner had been convicted of a sex offense, requiring registration as a sex offender. (CT 149; RT 57-58)

**Oscar Gonzalez** testified that he worked as a "program aide" at "The Armory," a winter homeless shelter at 400 N. Humboldt in San Mateo during the winter season of 1999-2000. (RT 58-59) Petitioner was a continuous resident between November and April. (RT 62) On March 13, 2000, Gonzalez intervened in an altercation between petitioner and "another client." (RT 63) In spite of petitioner's relevance objection, the witness was allowed to testify that petitioner became violent with him, resulting in the calling of the police. (RT 64-65)

Gonzalez identified People's Exhibit No. 2, a binder of "sign-in sheets," which the clients were required to sign and which Gonzalez and two other staff members were in charge of insuring that the "clients" signed every day. (RT 66-67)

**Jason Reed**, a City of San Mateo police officer was dispatched to The Armory on March 13 because of a disturbance. Petitioner was pointed out to him. (RT 71-72) The officer did a warrant check on petitioner and learned that he was a sex-offender registrant who "may not be in compliance with registration

10

obligation." (RT 73-74) He asked petitioner when he last registered and where, and petitioner said that he had registered on his birthday in Oakland. (RT 75) Asked whether he still resided at that address, petitioner responded that he was "homeless." (RT 75-76) Petitioner did not have his current registration card, which he said had been mailed to his mother's address, but he had an "expired" one, dated January 7, 1999. (RT 77-79) The officer asked petitioner when he last registered, and petitioner gave that date. (RT 79) Petitioner also said that he had been staying at The Armory for about two months. (RT 88)

The Director of Operations for Samaritan House in San Mateo, **Denis Lewis**, testified that Samaritan House administered the winter shelter at The Armory. (RT 94) "Guests" at The Armory were admitted to the shelter at 5:00 p.m. if they had a voucher, at which time they were issued a voucher for the following day. (RT 96) This was a device to discourage people without vouchers from appearing at the shelter, which ordinarily operated at capacity, and then remaining in the neighborhood. If a person did not appear with a voucher, then he could not get a voucher for the next night. (RT 96-97) The homeless people ordinarily signed themselves in. (RT 97) Exhibit 2 was the sign-in log for 1999-2000, and it showed that "Vance Rider" signed in on November 23, 24-30, and December 1-3, 5-31, 1999, January 1-31, February 2-7, 8-10, 12-27, and March 1-3, 5-12, 2000. (RT 98-120) On the dates on which there was no record of "Vance

11

Rider's" signing in, there were no sign-in sheets, perhaps because the National Guard used The Armory from time to time, and the shelter would be relocated to a church. (RT 119)

**Frank Alliger**, an employee of the "identification section" of the Oakland Police Department, who oversaw its registration of sex offenders, testified that People's Exhibits 1, 3, 4, 5, and 7, were, respectively, a "registration receipt," dated January 7, 1999, an "in-house data sheet," dated January 7, 1999, an "8102 form," mistakenly dated January 7, 1998 (the correct year was 1999),[2] an "8102 form," dated April 28, 1998, and a photograph, dated January 7, 1999, all evincing petitioner's registration in Oakland. (RT 122-134) According to the Alameda County "CORPUS" system, there were no subsequent registrations (in Alameda County?). (RT 134-135) If petitioner had moved out of the jurisdiction and notified the Oakland police department, Mr. Alliger would expect to find a "supplemental 8102 form," stating "moving out of jurisdiction." (RT 135-136)

Although the law requires only that a registrant inform the agency with which he last registered of a change of address "in writing" (§ 290, subd. (f)(1)),

---

[2] Mr. Alliger testified that he believed that petitioner had mistakenly dated the form "1/7/98" when he signed it, and that the true date was January 7, 1999, "because we had no registration for 1-7-98" and the "in-house data sheet" (Exh. 3) stated that the last registration was 4-28-98. (RT 129; see prosecutor's argument at RT 192) The "VCIN Individual FCN Record" (CT 101) lists registrations of January 7 and April 22, 1998, but none of January 1999.

12

the Oakland Police Department requires registrants to appear personally at the department to report a change of address, and if it receives a written report in the mail, "it would not be entered in the system."  (RT 136, 140-141) The list of registration duties on the back of the "registration receipt" says nothing about appearing personally at the department.  (RT 143)

Mr. Alliger did not register petitioner or directly supervise the person who registered him but was merely the custodian of records.  (RT 138)   The job of "admonish[ing registrants] about their responsibilities" is performed by the technician assigned to the fingerprint room.  (RT 124)

**Irma Lewis**, was the technician who registered petitioner on January 7, 1998, and placed her name on the form (Exh. 4).  (RT 148-149) She also testified that she  registered petitioner on January 9, 1999, and issued the "registration receipt" (Exh. 1) of that date.  (RT 151-152) She registered petitioner again on April 28, 1998, as shown by Exhibit No. 5.  (RT 152-153) After the registrant has been fingerprinted, the technician does a "summary advising" of the registrant that, "if they should move from our jurisdiction, which is Oakland, they need to come in to do a moving out of jurisdiction with us, and that they are to report to the nearest police department in the jurisdiction where they are moving to."  (RT 148, 155) Ms. Lewis did not have any recollection of petitioner.  (RT 159)

**Lt. Kevin Raffaelli** was records manager for the San Mateo Police

13

Department between November 1999 and March 2000. He checked the department's records and found no record that petitioner had ever registered. (RT 164-165) The department does not allow a person just to walk in and register; he has to make an appointment. There was no record that petitioner made an appointment. (RT 165-166)

The People rested after submitting People's Exhibit No. 6, a "sex registration packet generated by the Department of Justice." (RT 169-170) The "packet" was "redacted" so as to eliminate the pages which referred to the registration of April 28, 1998, and which contained references to law violations, "leaving only basically items that have fingerprints placed upon them." (RT 172, 174, 183-184) The prosecutor told the jury that the first 14 or 15 pages of the redacted packet showed prior registrations and the last 4 were notices, signed by petitioner, of the duty to register within 14 days (3 of them, dated April 1994 and May and December 1996) or 5 days (one of them, dated October 1997) of "moving into that shelter." (RT 189-190)

No defense was presented.

14

## 2. <u>Facts Relating to Petitioner's Mental Condition</u>

The following facts were <u>not</u> presented at trial, because the court excluded them, but they were shown by the record on appeal.

Petitioner's attorney informed the prosecutor before trial that he planned to call an expert on petitioner's mental condition, psychologist William J. Lynch, and presented her with a 13-page report as an "offer of proof." (RT 8) The report was not made a part of the record. The prosecutor demanded a pretrial hearing and a pretrial determination as to whether petitioner would be allowed to call the witness. She said that she suspected that the intended expert testimony would violate Penal Code section 28. (RT 9-10) Petitioner's attorney argued that section 290 requires a willful failure to register and that, under <u>People v. Garcia</u> (2001) 25 Cal.4th 744, 751, willfulness means with a purpose to make the omission in question, which logically entails knowledge of what the law requires and that the fact that a person has suffered brain damage which has impaired his memory is relevant to the issue of whether he had such knowledge. (RT 10-11) Rather than review the psychologist's report, the court ordered an *in limine* hearing. (RT 11)

Dr. Lynch has been the Program Chief with the Brain Injury Rehabilitation Unit of the Palo Alto Veteran's Administration Hospital since 1977. (RT 21-22) He had a private practice and had worked and testified for the District Attorney's Office a number of times, mainly as a expert in brain damage. (RT 21, 23)

15

Dr. Lynch administered a series of standardized psychological tests to

petitioner. (RT 24) On the Wechsler Adult Intelligence Scale, petitioner's verbal

I.Q. was measured at 70, his nonverbal as 73, and his full-scale as 69, lower than

98% of the population.  Persons with that level of I.Q. generally experience

> difficulty with memory, planning, problem-solving, the kinds of
> things that generally require more sophisticate brain functioning and
> overall intellectual sophistication.  A person can carry on their
> everyday life, but what they tend not to do is project very far into the
> future in terms of planning, then tend not to anticipate multiple
> consequences of their actions, and they tend not to reflect on past
> actions as people with higher I.Q.s tend to do.

(RT 26)

Such persons have difficulty in following multi-stage instructions and to keep

things in proper order.  (RT 26-27) The longer a gap between the instructions and

the action, the more likely there would be loss or distortion of information.  (RT

27)

According to Dr. Lynch, petitioner's memory was consistent with the I.Q.

test.  His ability to remember a design was better than his verbal memory.  (RT 28-

29) Generally, petitioner did better with nonverbal than with verbal material.

Petitioner's verbal expression was simplified and lacking in details.  His

vocabulary was impoverished.  (RT 29) He had difficulty repeating a list of words,

and when the psychologist read him a story, he could remember very few details.

16

It seemed like he was unable to organize information and lacked a method for recalling it. (RT 30) Petitioner was a "poor historian" for events in his own life. (RT 31) He could recall his birthday. (RT 35)

In Dr. Lynch's opinion, petitioner could remember simple instructions if they were explained to him orally and if he were provided with a simple written reminder of them, but

> I guess the larger problem is, does he continually keep this
> information in mind and the consequences and why it's important
> that he follow these instructions. I think at this level of intelligence,
> there's a tendency to just kind of drift off and not keep a close tab on
> your everyday behavior, and I think if things go on without a
> consequence, there's a tendency I think to just drift away from the
> regulations.
>
> (RT 36-37)

On the other hand, if there were something that was critical to petitioner's well-being, he would remember that better and the number of times something was repeated, the better would be his chances of remembering it. (RT 37-38)

A more complete statement of the psychologist's opinion and the results of the numerous psychological tests he performed was set forth in his report. The Court of Appeal granted petitioner's Application for Augmentation of the Record, to which a copy of the report was attached and which set forth the contents of the report at length, on November 9, 2005. A copy of the report is attached hereto as Exhibit C.

17

## STATEMENT OF THE LAW

**Claim 1**: **PETITIONER WAS DENIED HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION TO THE DUE PROCESS OF LAW, TO PRESENT A DEFENSE, TO CALL WITNESSES IN HIS OWN BEHALF, TO PRESENT ALL RELEVANT EVIDENCE, AND TO A JURY TRIAL, WHERE THE TRIAL COURT TOTALLY EXCLUDED EXPERT OPINION EVIDENCE AS TO HIS LIMITED INTELLIGENCE AND ABILITY TO REMEMBER HIS DUTY TO REGISTER AS A SEX OFFENDER.**

---

Petitioner will be explaining how he was denied his right to present a defense recognized by state law to the crime of failing to register as a sex offender. This was not only a violation of state law but also a violation of petitioner's rights under the United States Constitution to the due process of law, to present a defense, to call witnesses in his own behalf, to present relevant evidence, and to a jury trial. (U.S. Const., Amends. V, VI, XIV.)

## 1. The Defense to the Mental Elements of the Offense which Petitioner Intended to but was Prevented from Presenting

Petitioner's attorney informed the prosecutor before trial that he planned to call an expert on petitioner's mental condition, psychologist William J. Lynch, and presented her with a 13-page report as an "offer of proof." (RT 8; Exhibit C) The prosecutor demanded a pretrial hearing and a pretrial determination as to whether petitioner would be allowed to call the witness. She said that she suspected that

18

the intended expert testimony would violate Penal Code section 28. (RT 9-10)

Petitioner's attorney argued that section 290 requires a willful failure to register

and that, under People v. Garcia (2001) 25 Cal.4th 744, 751, willfulness means

with a purpose to make the omission in question, which logically entails

knowledge of what the law requires and that the fact that a person has suffered

brain damage which has impaired his memory is relevant to the issue of whether he

had such knowledge. (RT 10-11) Rather than review the psychologist's report, the

court ordered an in limine hearing. (RT 11)

At that hearing, petitioner presented the testimony of Dr. Lynch, which is

summarized above on pages 15-17.

The prosecutor argued that the purpose of the proffered testimony was "to

negate [petitioner's] capacity to form the mental state [at] issue which in this case

is knowledge of the requirements that he register as a sex offender," which is

prescribed by section 28. (RT 40) She also argued that the evidence was in

conflict with the evidence she intended to present which tended to show

circumstantially that petitioner did have knowledge and that it would not be fair to

attempt to negate knowledge by the expert's testimony and not subject petitioner to

cross-examination as to whether he had knowledge. (RT 40-41)

Petitioner's attorney argued that section 28 concerns only evidence of

mental disease, defect, or disorder, and that the evidence did not show any of those

19

things but just showed petitioner's intelligence relative to a standard. (RT 41, 44) The attorney said that he believed that it would be helpful to the jury to know how a person with petitioner's I.Q. functioned in order to be able to decide whether he knew what he was doing when he did it and whether he acted willfully. (RT 41-42)

The judge believed that the proposed testimony *was* about a mental defect and that it did not fit within the second sentence of subdivision (a) of section 28, which limits such testimony to whether or not the defendant actually formed a required specific intent, apparently because violation of section 28 does not required a specific intent. (RT 43) The judge therefore excluded the evidence. (RT 45)

At the conclusion of the prosecution's case, petitioner's attorney asked the judge to reconsider his ruling. (RT 170-171) The prosecutor replied that the court had already ruled that the evidence would only be admissible if it proved that petitioner did not have a required specific intent. (RT 171) Petitioner repeated his argument that the evidence did not show a mental disease or defect but that it did go to issues of willfulness and knowledge. The court denied the motion. (RT 172)

After trial, petitioner moved for a new trial on the ground of error in excluding the expert opinion testimony, relying in part on People v. Coddington (2000) 23 Cal.4th 529 and People v. Reyes (1997) 52 Cal.App.4th 975 (CT 269-

20

271, 281-283) The court denied the motion, basically on the same ground: that it believed that such testimony was not admissible except in the case of a specific intent crime, and that violation of section 290 was not such a crime. (RT 10/5/01, p. 9.)

The errors of the trial judge in this case were errors of elementary logic. The first error was the court's mistaken assumption that, because the proffered testimony related to petitioner's mental condition, it was evidence of a mental *defect*, when in fact it was evidence only of his mental *function*, which happened to be well below average. The second error, even assuming that evidence of subnormal intelligence and memory is evidence of a mental defect, was the court's nonlogical conclusion that, because evidence of mental defect *is* admissible to prove whether a certain mental state existed *in a specific intent case*, it follows that it is *not* admissible to prove whether *other* mental states exist in *other* types of cases. The third error was the court's failure to recognize that, even if the evidence were of a mental defect and even if it were admissible only in a specific intent case, this case was analytically identical to a specific intent case.

## A. **Evidence of low I.Q. is not evidence of "mental defect"**

The term "mental defect," as used in California Penal Code sections 25, 28, and 29, is a catchall term for abnormalities of the brain which impair cognitive functioning. Those statutes legislatively overruled the judicially declared law of

21

diminished capacity – the "Wells-Gorshen" rule (see 1 Witkin & Epstein, Calif. Crim. Law (3rd ed. 2000) "Defenses," §22, p. 352) – and adoption of the "Durham" or "A.L.I." definition of insanity. (People v. Drew (1978) 22 Cal.3d 333, 345 ["'A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law'"]; see In re Ramon M. (1978) 22 Cal.3d 419, 427 [the phrase "mental disease or defect" derives from the opinion of Judge Bazelon in Durham v. United States (D.C. Cir. 1954) 214 F.2d 862].) The Durham definition of "mental defect," as stated in that case and further explained in McDonald v. United States (D.C. Cir. 1962) 312 F.2d 847, 851, "plainly encompasses mental retardation ...", as does the A.L.I. test. (Ramon M., supra at p. 428.) "[D]efendant's mental retardation constitutes a defense to criminal conduct if 'at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.'" (Ibid.)

Thus, evidence of mental retardation would be evidence of mental defect, which *would have been* admissible to prove insanity under the Durham/A.L.I. test or diminished capacity under the Wells-Gorshen rule, and now, under subdivision (a) of sections 25 and 28, is no longer admissible to show or negate the capacity to

22

form intent, knowledge, or other mental states.

Petitioner, however, did not offer any evidence of mental defect or mental retardation, for those purposes or otherwise. His offer of proof, in the form of Dr. Lynch's testimony, did not employ either term.[5] (RT 21-29) Petitioner's attorney said that he was not offering the evidence to prove a mental defect. Instead, he was offering it because he believed that it would be helpful to the jury to know how a person with petitioner's I.Q. functioned in order to be able to decide whether he knew what he was doing when he did it and whether he acted willfully. (RT 41-42)

---

[5] Based on petitioner's full-scale I.Q. of 69, as measured by Dr. Lynch, evidence might have been presented that he was mildly mentally retarded. According to some sources, including the Diagnostic and Statistical Manual - IV of the American Psychiatric Association, I.Q.s in the range of 50-55 to 70 indicate mild mental retardation. (D.S.M.- IV (1994), p. 40.) (It is recognized, however, that the standard tests have a margin of error of 5 points, so a score of 69 could mean an I.Q. of anywhere between 64 and 74, of which the latter would be outside the mildly retarded range and in the borderline mentally retarded or "dull normal" range.) According to the American Association on Mental Retardation, mental retardation is defined in terms of adaptation to the environment and interaction with others by a person with limited intellectual function, as opposed to classification based on I.Q. alone. (Merck Manual of Diagnosis and Therapy, Chap. 262 "Developmental Problems," available online at www.merck.com/ pubs/mmanual/section19/chapter262/262e.htm.) The 1368 report of Dr. Farrell, admitted at the hearing of January 31, 2001 (RT 1/31/01, p. 4), stated that on the Wechsler Adult Intelligence Scale-Revised petitioner had an "overall verbal IQ of 74 ", which "is outside the mentally retarded range." But petitioner did not propose to prove those facts, and there is no reason to believe that the jury would know them in the absence of evidence. Thus, although, in fact, petitioner may have been mildly mentally retarded, petitioner did not offer any evidence to prove that fact.

23

Section 290 requires a "willful" violation.  (Subd. (g)(2).)

"The word 'willfully' implies a 'purpose or willingness' to make the omission. ... Logically one cannot purposefully fail to perform an act without knowing what act is required to be performed. ... Accordingly, a violation of section 290 requires actual knowledge of the duty to register." (<u>People v. Garcia, supra</u>, 25 Cal.4th at p. 752)  Knowledge may be inferred from notice, "but notice alone does not necessarily satisfy the willfulness requirement." (<u>Ibid.</u>; see <u>People v. Edgar</u> (2002) 104 Cal.App.4th 210, 220.)

It follows from the foregoing that evidence which tends to show that a defendant had or did not have a "purpose" or did or did not "know" what he was required to do or which negates the inference to be drawn from notice would be relevant to the issue of whether the defendant had the intent necessary for violation of section 290.

Any evidence as to whether or not a defendant actually had a purpose *not* to register would be probative.  For example, evidence that a defendant made out a list of things to do during a particular week, one of which was to register, that the other things on the list were things that he wanted to do and had no reason not to do, that he omitted to do all the things on the list, and that there was some common cause of his omitting to do all those things, such as that he suffered from the forgetfulness of old age, would tend to show that he did not have a purpose *not* to

24

register.

Similarly as to "actual knowledge": evidence which increased or decreased the probability that the person had or did not have knowledge of what the law required him to do would be admissible. For example, looking at it from the prosecution's side, evidence that a sex offender had read section 290 from beginning to end and had scored highly on tests of memory and intelligence would help to prove that he knew what that section required. The evidence would not have to show that he was a genius or had a photographic memory – whatever the opposite is of having a "mental defect" – in order to have that tendency, but to the degree that it showed that he was above average in intelligence, it would increase the probability that he knew the requirements. Conversely, evidence – including evidence that the defendant scored poorly on tests of intelligence and memory – would tend to show that he did not understand or remember and, hence, did not know what the section required.

Likewise as to evidence which related to the question of whether knowledge could be inferred from notice: evidence that a person got the notice but did not "get" the knowledge would be relevant. For example, evidence that the defendant was dyslexic[6] would weaken the inference that, after he signed a

---

[6] Experts in the field say that dyslexia is not correlated with intelligence. (See www.dyslexia-ca.org/symptoms.htm.) In fact, it is defined in terms of reading achievement substantially below that expected given the persons intelligence and

25

statement that he had read and understood the registration requirements, he had

actual knowledge of them.  He may have looked at the words but not have

processed them in such a way as to grasp their meaning.

     The point of the above is that there are mental states which deviate from the

normal and which are relevant to the issues of whether the defendant had the

mental states required by section 290 in spite of the fact that they are not *so*

abnormal that they constitute a mental defect or its counterpart on the other side of

normality.  Evidence that petitioner was severely mentally retarded might be

evidence of a mental defect, but evidence of only mild or borderline retardation is

not.  Evidence of severe retardation would be highly probative on the issues of the

existence of the mental states, but it does not follow that evidence of mild

retardation is not probative at all.  Any evidence which shows that the defendant

has a higher or lower ability to absorb, retain, process, and use information helps

the jury to decide whether, in fact, he had the required mental states.

     In People v. Bobo (1990) 229 Cal.App.3d 1417, 1442,[7] the court said that

---

other factors.  (Am.  Psychiatric Asso., Diagnostic and Statistical Manual of
Mental Disorders (4th ed. 1994) p. 50.)  So the condition is certainly not a mental
defect in the same sense that extremely low intelligence may be considered a
mental defect.

[7] Review was granted in Bobo on October 11, 1990; then, on December 11, 1991,
the Court of Appeal opinion was ordered published; finally, on February 13, 1992,
review was dismissed as improvidently granted and it was ordered that the opinion
remain published.  (See People v. Saille (1991) 54 Cal.3d 1103, 1114, fn. *.)  Bobo

"if a crime requires a particular mental state, the Legislature *cannot* deny a defendant the opportunity to prove he did not entertain that state."

The California Supreme Court has recognized that evidence of abnormal mental conditions, although not admissible to prove the defendant's inability to form the intent or other mental state required for the crime, is admissible to raise a doubt about whether he actually formed the mental state. Thus, in People v. Saille (1991) 54 Cal.3d 1103, 1120, where the abnormal mental state at issue was intoxication, the court stated:

> [T]he defendant's evidence of intoxication can no longer be proffered as a defense to a crime but rather is proffered in an attempt to raise a doubt on an element of a crime which the prosecution must prove beyond a reasonable doubt. In such a case the defendant is attempting to relate his evidence of intoxication to an element of the crime.

In People v. Coddington (2000) 23 Cal.4th 529, a death penalty case, the defendant proposed to introduce psychiatric opinion evidence on "diminished actuality." The trial court ruled that he could present evidence of mental disease or defect but that the psychiatrist could not testify as to how it affected his mental state unless the psychiatrist first testified, out of the presence of the jury, that in his opinion the defendant did not deliberate or premeditate the killings. The Supreme

---

is cited by Saille for the proposition that, if a defendant in a murder case shows that because of an abnormal mental state he did not in fact form the intent to kill, the killing can be no greater than involuntary manslaughter. (Id. at pp. 1116-1117.)

27

Court held that this was "an overly restrictive reading of the statutory limitations on admission of evidence of mental illness." (Id. at p. 582.) Expert opinion evidence on whether the defendant had the *capacity* to form a mental state or on whether the defendant actually formed the state is not admissible, but "Sections 28 and 29 permit introduction of evidence of mental illness when relevant to whether a defendant actually formed *a specific mental state* that is an element of a charged offense ...." (Ibid. [italics added; footnotes omitted].) The court recognized that expert opinion that mental illness could lead to impulsive behavior, which would be inconsistent with deliberation and premeditation, would be relevant regardless of whether the expert believed that the defendant actually formed those mental states. (Id. at pp. 582-583.) "Sections 28 and 29 do not preclude offering as a defense the absence of a *mental state* that is an element of a charged offense or presenting evidence in support of that defense." (Id. at p. 583 [italics added].) The court said that the defendant "was free to offer evidence that he suffered from a mental disease or defect as well as evidence about that disease or defect" and could have introduced evidence at the guilt phase (which he did introduce at a sanity phase) "about his mental illness ... from which the jury could infer that he did not premeditate or deliberate the murders ...." (Id. at pp. 583-584.) However, there was no error because no expert expressed the opinion that the defendant's mental illness affected his ability to premeditate and deliberate, the defendant did

28

not actually offer the evidence at the guilt phase, and there was no reason to

believe that the restriction on the evidence caused him to fail to offer it. (Id. at p.

584.)

The present case is comparable to Coddington, except that here petitioner

*did* actually offer the expert opinion testimony. The mental states at issue here

were willfulness, purpose, and knowledge. The mental conditions as to which

petitioner's expert would have testified were not a mental disease or defect but low

intelligence and poor memory. He was prepared to testify as to how those mental

conditions would affect the mental states which were the elements of the crime.

According to Coddington, sections 28 and 29 do not preclude the admission of

such evidence. On such evidence the jury could have based an inference that

petitioner did not, in fact, willfully -- i.e., purposefully and with knowledge of the

registration requirement -- fail to register.

**B. Evidence of "mental defect" is admissible in non-specific-intent cases**

Even if evidence of mild retardation is evidence of a "mental defect," the

trial judge nevertheless erred in excluding it. The judge looked only at the second

sentence of subdivision (a) of section 28 and misunderstood it. (RT 43) That

sentence states: "Evidence of mental disease, mental defect, or mental disorder is

admissible solely on the issue of whether or not the accused actually formed a

required specific intent ... [etc.], when a specific intent crime is charged." The way

29

the judge read it was as though the word "solely" applied to the final clause, "when

a specific intent crime is charged" – i.e., that "evidence of mental disease, etc., is

admissible solely when a specific intent crime is charged." The sentence would be

clearer if that clause had come first,[8] but it is clear enough that the word "solely"

applies to the preceding clause, "on the issue of whether or not the accused

actually formed a required specific intent ..."-- i.e., it means that evidence of

mental disease etc. is admissible solely on the enumerated issues. The preceding

sentence specifies what evidence of mental disease etc. is *not* admissible to prove,

and the point of the second sentence is to specify what it *is* admissible to prove.

The second sentence does not purport to limit the admissibility of evidence of

mental disease etc. for all purposes but merely to say what use may be made of it

in a specific intent case in which, according to the first sentence, it cannot be used

to show or negate the capacity to form a mental state. That must be obvious,

because evidence of mental disease is admissible to prove many things, not just the

lack of the mental state in a specific intent crime. For example, it could be used to

prove that a witness who claimed to see a certain thing was hallucinating.

    In fact, even section 28 recognizes that the court may admit evidence that

the defendant suffered from a mental defect at the time of the offense. Subdivision

---

[8] I.e., "When a specific intent crime is charged, evidence of mental disease,
mental defect, or mental disorder is admissible solely on the issue of whether or
not the accused actually formed a required specific intent ... [etc.]."

(d) provides that "Nothing in this section shall limit a court's discretion ... to exclude psychiatric or psychological evidence on whether the accused had a ... mental defect ... at the time of the alleged offense." The discretion to exclude the evidence implies the discretion to admit it. An exercise of discretion involves a choice between alternatives. It would be pointless to refer to the court's choice to exclude the evidence if the court did not also have the choice to admit it.

Section 28 is the "legislative" abolition of the judicially declared defense of "diminished capacity." It was enacted in 1981 and became effective January 1, 1982. (Stas. 1981, chap. 404, p. 1592, §4.) On June 8, 1982, the voters passed Proposition 8, which was a constitutional amendment; it contained the language which is codified as Penal Code section 25, which is the "initiative measure" abolition of the law of diminished capacity. Proposition 8 also added Article 1, section 28(d) to the state Constitution, the "truth-in-evidence" provision, which provides that in a criminal case, all relevant evidence is admissible, with certain exceptions not applicable here. Obviously, the later-enacted constitutional provisions "trump" the earlier-enacted statutory provision. Section 25 has language similar to the first sentence of subdivision (a) of section 28, stating what evidence of mental disease etc. is *not* admissible to prove. It has no language similar to the second sentence of that subdivision, stating what such evidence *is* admissible to prove and in what kind of case. For that, we have to look at Article

31

1, section 28(d), which provides that all *relevant* evidence is admissible. Thus, read together, section 25 and Article 1, section 28(d), provide that evidence of mental disease etc. is *not* admissible to prove lack of capacity to form a mental state required for the commission of a crime but *is* admissible to prove any other issue to which it is *relevant*. Evidence of mental disease etc. is relevant to prove that an accused did not actually form a mental state required for the commission of a crime. Therefore, under the constitutional provisions, there is no limitation on the use of such evidence for that purpose.

Further, section 29, added as part of a bill which amended section 28 (Stats. 1984, chap. 1433, §§ 1 and 3) also recognizes that an expert may testify as to a defendant's mental defect. It provides that "In the guilt phase of a criminal action, any expert *testifying about a defendant's ... mental defect* shall not testify as to whether the defendant had or did not have the required mental states, which include ... knowledge ... for the crimes charged." (Italics added.) In other words, an expert *can* testify about a defendant's mental defect *without* testifying that he did not have a mental state such as knowledge. He can relate the nature of the mental defect from which the defendant suffered, and the jury can then decide, based on that and other evidence, whether the defendant had the mental state.

Assuming for the sake of argument that Dr. Lynch's proposed testimony about petitioner's relatively low I.Q. score and what it and the results of the

32

memory tests showed was evidence of a mental defect, the foregoing is exactly the purpose for which petitioner offered the testimony – to aid the jury in deciding whether, in fact, petitioner had knowledge of the registration requirement and willfully failed to comply with it.

## C. Section 290 is analytically indistinguishable from a "specific intent" crime

It is assumed for the sake of this particular part of the argument that the trial court's view was correct -- that evidence of low intelligence *is* evidence of mental defect and that the second sentence of subdivision (a) of section 28 restricts such evidence to the issue of whether or not a defendant actually formed specific intent in a specific intent case. We show how, analytically, the present case *is* a specific intent case.

Specific intent crimes are defined as crimes, the intentional element of which is "to do some further act or achieve some additional consequence." (People v. Hood (1969) 1 Cal.3d 444, 457; People v. Atkins (2001) 25 Cal.4th 76, 82.) On that definition, however, assault could equally well be characterized as a general or a specific intent crime, because it involves an attempt – and, therefore, an intent – to commit a battery. (People v. Hood, supra, 1 Cal.3d at pp. 457-458; see People v. Whitfield (1994) 7 Cal.4th 437, 449.) However, for reasons of policy, assaults are excluded from the category of specific intent crimes. (Hood, supra, at p. 458.) The policy is that, because intoxication negates specific intent

33

(Pen. Code, §22, subd. (b)), but it would be socially undesirable for intoxication, which increases the probability of assaultive behavior, to be recognized as a defense to assault, assault should not be considered a specific intent crime. (<u>Ibid</u>.) Thus, a "social-political" definition of a specific intent crime is a crime as to which intoxication is recognized as a defense. (<u>Id</u>. at p. 455; <u>People v. Whitfield, supra</u>, 7 Cal.4th at p. 449; see <u>People v. Atkins, supra</u>, 25 Cal.4th at p. 90.)

Subdivisions (g)(1) and (g)(2) of section 290 require "willful" violations of the provisions of that section. Ordinarily, "willfulness" defines general intent. However, where an omission to act is concerned, something more is required. That is because willfulness implies a purpose to make an omission, and "logically one cannot purposefully fail to perform an act without knowing what act is required to be performed." (<u>People v. Garcia, supra</u>, 25 Cal.4th at p. 752.) It is not enough for a person who is required to register to fail to perform an act which is required by section 290 to be performed, he must fail to perform the act with the knowledge that he is required to perform it and the purpose of not performing it. (<u>Ibid</u>.) That is very close to saying that he must have the intent to bring about a result – i.e., noncompliance with the requirements of section 290 – which is the definition of a specific intent crime.

In <u>People v. Whitfield, supra</u>, 7 Cal.4th 437, the question was whether evidence of intoxication was admissible to rebut the existence of implied malice in

34

a murder case, in spite of the fact that implied malice murder does not require

specific intent – i.e., intent to kill. "Malice," the court said, "is implied '"when a

person does an act, the natural consequences of which are dangerous to life, which

act was deliberately performed by a person who knows that his conduct endangers

the life of another and who acts with conscious disregard for life. ...'"'..." (Id. at p.

450.) The court held:

> Although it can be argued that implied malice does not constitute a
> specific intent as described in Hood because it does not involve an
> "intent to do some further act or achieve some additional consequence,"
> it is quire clear that implied malice does not fit Hood's description of
> general intent, which is "an intent merely to do a violent act."
> [Citation.] Although implied malice may not fall literally within the
> Hood formulation of specific intent, the element of implied malice that
> requires that the defendant act with knowledge of the danger to, and in
> conscious disregard of, human life, is closely akin to Hood's definition
> of specific intent, which requires proof that the defendant acted with a
> specific and particularly culpable mental state. Thus, read in context,
> the phrase "when a specific intent crime is charged" in section 22
> includes  murder, even where the prosecution relies exclusively upon
> the theory that malice is implied rather than express.

> (Id. at p. 450 [fn. omitted]; see People v.
> Fabris (1995) 31 Cal.App.4th 685, 696, fn. 10.)

Whitfield was legislatively overruled on this point by amendment of section

22 in  1995 (Stats. 1995, chap. 793, §1), but its reasoning remains sound.  It was

applied in People v. Reyes (1997) 52 Cal.App.4th 975, cited in petitioner's motion

for new trial, to the crime of receiving stolen property, which is usually classified

35

as a general intent crime but which requires not merely that the defendant intend to possess stolen property but also that he know that it is stolen. Citing Whitfield, the court in Reyes observed that "the classification of the crime as one of general intent has nothing to do with the required element of knowledge, a specific mental state." (Id. at p. 985.) The court cited People v. Bobo, supra, for the proposition that the Legislature cannot define a crime as requiring a specific mental state and then prevent him from introducing evidence as to the nonexistence of that state. The court noted that Saille, supra, sanctioned the admission of evidence of intoxication to raise a doubt about the existence of an element of the crime. Accordingly, it held that "with regard to the element of knowledge, receiving stolen property is a 'specific intent crime,' as that term is used in section 22, subdivision (b), and section 28, subdivision (a)." (Ibid.) Because there was evidence that Reyes was intoxicated with drugs when he possessed the stolen property, it was error to instruct that the crime was a general intent crime and to refuse instructions that there must be a joint operation of act and a certain mental state. "We conclude the total preclusion of evidence regarding Reyes's myriad of mental disorders, and their exacerbation by drug abuse, unfairly denied him the opportunity to prove he lacked the requisite knowledge", which, together with the instructional errors, was prejudicial. (Id. at p. 986.)

The Whitfield reasoning applies directly to the present case. Where the

36

offense consists not only of an omission to act but also knowledge of what act is required, the crime does not fit the description of general intent. Although it may not squarely fit the definition of specific intent, either, the requirement of an omission with knowledge of the act required "is closely akin to <u>Hood</u>'s definition of specific intent." (<u>Whitfield, supra</u>, 7 Cal.4th at p. 450.) Thus the phrase of section 28, subdivision (a), "when a specific intent crime is charged" includes violation of section 290. (<u>Ibid</u>.)

There is no reason of social policy why violation of section 290 should not be treated as a specific intent crime. Unlike a person who becomes intoxicated and thereby becomes more likely to commit an assault, a person required to register as a sex offender who becomes intoxicated is not more likely to omit to comply with section 290. Of course, he is not likely to comply with it *while* he is intoxicated, but almost all of the acts required by section 290 have a 5-day grace period, and he is not likely to be intoxicated for that entire period. A person who becomes intoxicated for 5 days is not appreciably more likely to fail to comply than he would have been if he had not become intoxicated. The problem of people getting drunk and not registering is nothing like the problem of people getting drunk and becoming assaultive.

There is no rational basis for distinguishing between the admission of evidence of intoxication to negate the actual formation of specific intent, which

37

section 22, subdivision (b), specifically authorizes, and its admission to negate other mental states which are elements of crimes. A person is not guilty of a crime which requires specific intent if, because of intoxication, he did not actually form the intent. In just the same way, a person is not guilty of a crime which requires knowledge if, because of intoxication, he did not actually have the knowledge. Thus there is no rationale for admitting evidence of intoxication to negate specific intent and *not* admitting it to negate other required mental states – i.e., for treating crimes which require other mental states differently from crimes which require specific intent. A person who does not have the required knowledge because of intoxication is no more guilty that a person who does not have the specific intent due to that condition.

Intoxication may be the touchstone of what is and what is not recognized as a specific intent crime, but it is not only evidence of intoxication which negates specific intent. Evidence of mental disease or defect negates specific intent in the same way. It also negates other mental states which are the elements of crimes, such as knowledge. Just as there is no reasonable justification for treating evidence of intoxication to negate other mental states differently from evidence of intoxication to negate specific intent, there is no justification for treating evidence of mental disease or defect to negate other mental states differently from evidence of mental disease or defect to negate specific intent.

38

**D. _People v. Sorden_ Settled the Question of Whether Section 28 Precludes Admission of Evidence of Low Mental Functioning in a Secion 290 Case.**

In People v. Sorden (2005) 36 Cal.4th 65, 69, the California Supreme Court ruled:

> The Attorney General contends willful failure to update one's registration as a sex offender is a general intent crime, and, therefore, evidence that defendant forgot to update his registration due to depression was inadmissible under section 28, subdivision (a). [Fn. omitted.]   Defendant responds that the due process right to present a defense trumps section 28 in the circumstances of this case.

> We need not address section 28 or its constitutionality to resolve this case. All we need do is construe section 290. We have been mindful of due process considerations in interpreting section 290. In People v. Garcia (2001) 25 Cal.4th 744 (Garcia), we held that the willfulness element of a section 290 violation requires _actual knowledge_ of the duty to register. We now hold that the willfulness element of the offense may be negated by evidence that an involuntary condition--physical or mental, temporary or permanent--deprived a defendant of actual knowledge of his or her duty to register.  Only the most disabling of conditions, we emphasize, would qualify under the standard we announce today. Severe Alzheimer's disease is one example that comes to mind; general amnesia induced by severe trauma is another.

At one point in its Opinion (Exhibit A), the Court of Appeal appeared not to have heeded that ruling.  On pages 9-10, the court repeated what it said in its pre-Barker/Sorden 2003 opinion, where it said that the trial court correctly excluded Dr. Lynch's expert opinion testimony as to petitioner's general mental condition and, in particular, his intellectual deficits, because such testimony would be

39

improper evidence of his "capacity" to commit the crime, which is prohibited by Penal Code section 28.  This was directly contrary to the Supreme Court's ruling in Sorden, quoted above, that section 28 does *not* prohibit the admission of such evidence.  The court expressly recognized that evidence of severe Alzheimer's Disease would be admissible, and such evidence could, of course, be characterized as evidence that the defendant lacked the "capacity" to form the mental states.

Then the Court of Appeal misconstrued petitioner's argument to be an argument that sections 28 and 29 precluded admission of Dr. Lynch's proposed testimony *and that they were therefore unconstitutional*:

> Although defendant views the ruling as denying him his right under the United States Constitution to present a defense, our Supreme Court has concluded otherwise: "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense.  They preclude only expert opinion that the element was not present." (People v. Coddington [2000] 23 Cal.4th 529, 583.)  These statutes did not preclude defendant from testifying himself, nor presenting corroborating testimony by nonexperts, detailing any previous incidents of forgetfulness, to attempt to establish that his failure to register was attributable to his inability to remember his obligation to register.  That did not occur.
>
> (Exhibit A, p. 10.)

In fact, petitioner's arguments were that sections 28 and 29 did <u>not</u> preclude admission of the psychologist's testimony – and the Supreme Court so held in Sorden.

40

## 2. <u>The Court of Appeal Failed to Apply a Correct Substantial Evidence Test</u>

Then the Court of Appeal purported to apply <u>Sorden</u> but failed to apply the correct "substantial evidence" rule and, instead, treated the issue as though it were a question of whether there was any substantial evidence that petitioner <u>did</u> willfully or knowingly fail to register, rather than any substantial evidence that he did <u>not</u>, and held that there was substantial evidence that he did. (Exhibit A, pp. 11-13)  The correct question is whether there was any evidence on the basis of which a jury could reasonably have a doubt about whether petitioner had the required mental states.  Finding that there was some evidence – <u>which the jury had never heard</u> – that he did have those states, the Court of Appeal concluded that petitioner had no right to present the expert opinion evidence on the basis of which the jury might have formed a doubt that he did.  The appellate court thus acted as though it were the jury and resolved the factual issue adversely to petitioner, which was a *further* denial of petitioner's right to a jury determination of the issue. (See <u>Sullivan v. Louisiana</u> (1993) 508 U.S. 275, 279-280.)   The correct test of whether the expert opinion testimony  was "substantial evidence" and whether, therefore, petitioner had a right to introduce it is whether it was "evidence sufficient to 'deserve consideration by the jury,' that is, evidence that a reasonable jury could find persuasive." (<u>People v. Lewis</u> (2001) 26 Cal.4th 334, 369; <u>Stevenson v. United States</u> (1896) 162 U.S. 313, 315 ["so long as there was some evidence

41

relevant to the issue ..., the credibility and force of such evidence must be for the jury, and cannot be matter of law for the decision of the court"].)

The error in excluding the evidence of the absence of the mental elements had the same effect as would an error in failing to instruct the jury as to those elements: in both cases, the evidence of the nonexistence of the elements is removed from the jury's consideration. The test of the harmfulness of that error is "whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element." (Neder v. United States (1999) 527 U.S. 1, 17.) This test was applied by the California Supreme Court in People v. Garcia, supra, 25 Cal.4th 744, 755, in terms of whether a jury properly instructed as to the element would, beyond a reasonable doubt, have found the existence of the mental element.

So the question is whether the appellate court can conclude that no rational jury could have had a reasonable doubt as to whether petitioner actually formed the mental elements of knowledge of the registration requirements and willful failure to comply with them, based on the excluded expert opinion evidence.

Instead of applying this test – i.e., considering whether a jury could possibly have a reasonable doubt based on the excluded evidence – the Court of Appeal, in its Opinion (Exhibit A, pp. 11-13) considered the conflicting evidence, resolved those conflicts unfavorably to petitioner, and concluded that it was not probable

42

that he lacked the mental elements. In doing so it failed to consider whether the excluded testimony might persuade a rational jury and, instead, substituted its judgment for that of a jury and found that *it* was not persuaded.

The court did this first by considering the proffered testimony of Dr. Lynch that petitioner has an I.Q. and compares it to the fact, <u>which was not presented to the jury in this case</u> and might not have been, even if Dr. Lynch had been allowed to testify, that another psychologist, Dr. Farrell, measured petitioner's IQ at 94[9] and 74: "Granted, Dr. Lynch testified that defendant has an I.Q of 69. But Dr. Farrell administered two tests, one of which fixed defendant's I.Q. at 94, the second at 74." (Exhibit A, p. 12.) This implies that the court weighed Dr. Lynch's excluded testimony against Dr. Farrell's hypothetical testimony and concluded either that the latter outweighed the former or that the former was somehow diluted or weakened past the point of substantiality by the latter. But those would have been questions for the jury, if the testimony had been introduced. The jury

---

[9] This figure is more than a little misleading. It was derived from the "Test of *Nonverbal* Intelligence" which presents "visual matching and categorization problems," according to Dr. Farrell's report, page 2. This is hardly a test of general intelligence, and has virtually nothing to do with the ability to understand – and absolutely nothing to do with the ability to remember -- complicated *verbal* matters, such as registration requirements. Note Dr. Lynch's finding, based on *five* tests, including the Wechsler Adult Intelligence Scale, that petitioner's "poorest performance" was on subtests measuring "Comprehension, verbal abstract reasoning, mental flexibility, fluidity of thinking, categorical thinking, [and] ability to find salient bridging concepts between seemingly different words." (Report of Sept. 30, 2000, p. 7.)

43

would have been in a position to determine which expert was more credible, and it

could easily have concluded that the testimony of Dr. Lynch had greater

credibility.  His credentials included the fact that he had been the Program Chief

with the Brain Injury Rehabilitation Unit of the Palo Alto Veteran's

Administration Hospital since 1977.  (RT 21-22) The record tells nothing about

Dr. Farrell's credentials, except that he was a "staff psychologist" at the Golden

Gate Regional Center.  He could well have been a marginally qualified expert and

an incredible witness.

Then the court noted that Dr. Lynch found that petitioner's memory was

good for some things and that he complied with the registration requirements up to

a point. (Exhibit A, p. 12.)  Implicitly, in the Court of Appeal's opinion, these

aspects of Dr. Lynch's projected testimony would have contradicted or outweighed

other aspects of this testimony which were inconsistent with petitioner's being able

to remember and to comply with the registration requirements.  The court did not

mention the bulk of those other aspects, which are set forth at length in Exhibit C.

Again, whether to give greater weight to one aspect or another of the evidence

would have been for the jury to decide.

Another reason the jury may have had a doubt about whether petitioner had

the necessary knowledge or willfulness may have been that it made a careful study

of People's Exhibit No. 6, the multiple records of his past registrations, and

44

learned these facts:

• that on the documentation of petitioner's registrations of February 23, 1995, September 25, 1995, June 13, 1996, July 22, 1996, August 5, 1996, February 3, 1997, he was noted to be "on parole";

• that on the notifications of registration requirements which he signed on April 1, 1994, May 1, 1996, December 12, 1996, and October 24, 1997, his "parole or probation" was said to be due to expire on February 11 or April 21, 1998; and

• on the registration of April 28, 1998 – his last registration – it was noted in the box for probation or parole "case closed."

From the facts that petitioner registered regularly while he was on parole – in fact, on 21 occasions between the time he was released on parole in 1994 and the time he was discharged from parole in April 1998 – and that thereafter he failed to register, the jury could reasonably have surmised that he was able to "remember" to register only when prompted to do so by his parole officer.

In any case, whatever the reasons the jury had for struggling over whether petitioner willfully and knowingly failed to register, that question was for it to decide, based on all the relevant evidence – evidence that had a tendency in reason to prove – that petitioner did or did not actually form those mental states. It

45

appears from the circumstances of the jury's deliberations that Dr. Lynch's

testimony about petitioner's intellectual deficits and memory problems could easily

have been "dispositive." But petitioner does not have to show that much, only that

such testimony was "deserving of consideration" and that a rational jury could

have based a reasonable doubt about the existence of the mental elements on that

testimony. Petitioner certainly does not have to persuade an appellate court that

the weight of the evidence supports the non-existence of the elements, but that is

what the Court of Appeal's opinion required.

**3. Exclusion of the evidence violated petitioner's federal constitutional rights**

Even if the expert opinion evidence as to petitioner's mental limitations

were inadmissible under California statutes, it was admissible under the United

States Constitution.

A state statute which makes inadmissible a category of evidence which

would tend to negate the existence of an element of the offense impairs the

defendant's right to present a defense to the charge and contravenes the due

process clause of the United States Constitution.  (Rock v. Arkansas (1987) 483

U.S. 44 [defendant's right to present a defense denied by exclusion of defendant's

testimony under rule excluding all hypnotically refreshed testimony]; Chambers v.

Mississippi (1973) 410 U.S. 284 [exclusion of impeachment evidence under

common-law "voucher rule" and of testimony of three witnesses to whom witness

46

confessed violated due process]; <u>Washinton v. Texas</u> (1967) 388 U.S. 14 [Sixth

Amendment was violated by state statutes which prevented codefendants from

testifying for each other]; see <u>United States v. Scheffer</u> (1998) 523 U.S. 303, 315-

316..)

In <u>Holmes v. South Carolina</u> (2006) __ U.S. __, 126 S.Ct. 1727, the U.S.

Supreme Court held that a state court rule excluding evidence of the guilt of a third

party where the prosecution's evidence of the defendant's guilt was "strong" –

which the state court found to be true without considering the defendant's

evidence challenging the credibility and reliability of the prosecution's evidence –

"violates a criminal defendant's right to have ""a meaningful opportunity to

present a complete defense.""" (<u>Id.</u>, at p. 1735.)

The Supreme Court ruled that the state-court rule of admissibility did not

rationally serve the purpose of excluding evidence which did not support a

reasonable inference of the defendant's innocence (the "<u>Gregory</u>" rule) because

"by evaluating the strength of only one party's evidence, no logical conclusion can

be reached regarding the strength of contrary evidence offered by the other side to

rebut or cast doubt." (<u>Ibid.</u>)

That is precisely what the Court of Appeal did in this case: it held that

evidence of petitioner's defense that he lacked willfulness and knowledge was

inadmissible – i.e., failed to support a reasonable inference of petitioner's

47

innocence (lack of willfulness and knowledge) – because of the supposed strength of the evidence that he did have knowledge of the basic registration requirement.[10]

The Court of Appeal's opinion regards as "virtually dispositive" on the question of admissibility of petitioner's proffered evidence the *prosecution's* evidence that petitioner "was able to comply with the registrations requirements for a number of years." (Exhibit A, p. 12.)  As in Holmes, this ruling failed to evaluate the contrary inference to be drawn from the same evidence that the record of petitioner's prior registrations showed that he was able to comply only when he was on parole and, therefore, under the supervision of a parole agent.  (See RT 204, 207, and pp. 14-15 of Petition for Rehearing, filed December 23, 2005.)  It failed to consider other evidence which undermined the reliability of the prosecution's evidence of willfulness and knowledge, such as the lack of evidence that petitioner had been informed that he had to register when he acquired a "residence",  that he understood what constituted a "residence," or that he had "actual knowledge" that, under the circumstances, the Armory was his "residence" within the meaning of the registration law. (See People v. Edgar, supra, 104

---

[10] Here the trial court totally excluded under Penal Code section 28 evidence of Dr. Lynch's finding that petitioner has an I.Q. of 69 and his related testimony as to his limited mental ability, which went not so much to knowledge of the registration requirement *as to the willfulness of petitioner's failure to comply with it.*  The trial court did not even consider the relative strength of the prosecution's evidence and petitioner's contrary evidence.

48

Cal.App.4th 210, 221 ["the prosecution presented absolutely no evidence showing that petitioner also knew that acquiring a second residence address constituted a change in residence that required registration of the new address"].)

4. **Prejudice**

Because the court's refusal to permit him to call Dr. Lynch to testify as to his limited intelligence and poor memory was a denial of petitioner's federal constitutional rights, the error was subject to the "harmless beyond a reasonable doubt" standard of Chapman v. California (1967) 386 U.S. 18.

The error was prejudicial. The only defense that petitioner proffered was that he was confused about his registration duty and that he had not remembered to comply with it. The court's refusal to permit him to call Dr. Lynch prevented him from presenting *any* defense. Nevertheless, as will be shown in **Claim 2** below, the jury was extremely concerned about whether petitioner's failure to register was willful or merely negligent and, after extended deliberation, during which it announced itself hung, finally found him guilty only after the court directed it that, if he knew the registration requirement, then the failure was willful. There is no indication in the record that the jury had any inkling that petitioner was suffering from subnormal intelligence and memory, unless it could tell that from his appearance. Thus *any* evidence that he was less capable than the ordinary person to process and retain information could easily have reinforced the jurors' doubt

49

about whether petitioner knowingly and intentionally failed to register and have led

to acquittal or, at least, to solidification of the views of the jurors who had

expressed such doubt.

50

**<u>Claim 2</u>: PETITIONER WAS DENIED HIS RIGHTS UNDER THE UNITED STATES CONSTITUTION TO DUE PROCESS AND TO A JURY TRIAL BY THE COURT'S INSTRUCTION THAT, IF HE HAD KNOWLEDGE OF THE DUTY TO REGISTER, THEN HIS FAILURE TO REGISTER WAS WILLFUL, WHICH HAD THE EFFECT OF DIRECTING A VERDICT AS TO THE WILLFULNESS ELEMENT AND OPERATED AS A MANDATORY PRESUMPTION.**

---

The following events happened after the jury was instructed and began to deliberate.

The jury retired to deliberate at 12:18 p.m. on August 13, 2001, and immediately recessed for lunch. It resumed its deliberations at 1:26. (CT 155) At 2:00 it requested the written instructions. (CT 254)

At 3:00 p.m., the jury submitted a question: "On page 3.30 the word "intentionally" is used – can we get a clearer definition?" (CT 255; see 155) This was a reference to CALJIC No. 3.30, which purports to define "general criminal intent, and states "When a person **intentionally** does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." (CT 178) Thus it would appear that the jurors (or some of them) had a question as to whether petitioner intentionally failed to register. The judge and the attorneys discussed the note off the record, and the judge wrote a reply to the jury: "I am unable to do so." (CT 155, 255)

51

This was an error. The judge could have answered the question with an instruction that "intentionally" (or "willfully," the term which was used in the general instruction defining the offense [CT 179]) means "with a purpose or willingness to commit the act, or make the omission referred to." (§7; People v. Garcia, supra, 25 Cal.4th at p. 752.) The judge had a duty to assist the jury to understand the principles necessary for decision in the case, which he failed to discharge by telling the jury that he was "unable" to help. (Bollenbach v. United States (1946) 326 U.S. 607, 613-614 ["A conviction ought not to rest on an equivocal direction to the jury on a basic issue"]; People v. Beardslee (1991) 53 Cal.3d 68, 97 ["a court must do more than figuratively throw up is hands and tell the jury it cannot help"]; People v. Gonzalez (1990) 51 Cal.3d 1179, 1212 [Cal. Pen. Code, § 1138 imposes on the trial court a mandatory "duty to clear up any instructional confusion expressed by the jury"]; People v. Dominguez (2004) 124 Cal.App.4th 1270, 1279-1280; People v. Moore (1996) 44 Cal.App.4th 1323, 1331.)

The jury continued to deliberate and, at 4:21 p.m., requested a read-back of the testimony of officer Reed. (CT 155, 256) An unreported conference between the judge and attorneys was held, followed by the read-back, which concluded at 5:03. (CT 155-156) At 5:30, the judge released the jurors until 9:00 the next day. (CT 156; RT 235)

52

The jury resumed deliberations at 9:02 a.m. on August 14. At 10:02 the jury submitted a question: "Can a person do something willfully but not consciously?" (CT 257, 262) The judge consulted with counsel and answered the question with a typed note: "The question cannot be answered in that context, but I do invite your attention to the definition of 'willfully' in the pertinent instruction and, if it aids you, to the definition of 'knowingly' in that pertinent instruction." (CT 257) This was a reference to CALJIC Nos. 1.20 and 1.21. (CT 163, 164) The first essentially answered the jury's first question by defining "willfully" in terms of section 7 as "with a purpose or willingness to commit the act or to make the omission in question." So far, so good. But then the instruction added: "The word 'willfully' does not require any intent to violate the law, or to injure another, or to acquire any advantage." That was error, as explained above. Garcia makes it plain that "willfully" means "with a purpose" and that it is logically impossible to violate the law "with a purpose" unless one knows what the law is. (25 Cal.4th at p. 752.)

The error was compounded by reference to CALJIC No. 1.21. (CT 164) That instruction stated: "The word 'knowingly' means with the knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required." This instruction was erroneous, as explained above. As Garcia held, "In the registration act context, the jury must find actual knowledge of the act's legal requirements." (25 Cal.4th at p. 754.)

53

Thus the court gave a doubly erroneous answer to the jury's question as to whether a person can do something willfully but not consciously. It stated that willfulness does not require intent to violate the law and that knowledge that the act or omission is unlawful is not required. In other words, it informed the jury that a person *could* do something willfully but not consciously – i.e., without knowledge that his act or omission was unlawful. A correct answer in the 290 context would have been exactly the opposite: a person cannot willfully fail to register without being conscious of the fact that he was required to register.

It should have been clear at this point that the jurors (or some of them) had doubts that petitioner willfully failed to register, based on the lack of evidence that he was conscious of the duty to register.

At 10:56 a.m., the jury asked yet another question along the same lines: "If a person fails to perform an act they know they must do, is that a willful act?" (CT 258, 262) The judge consulted with the attorneys and at 11:06 responded to the question with a handwritten note: "Again, you must use the pertinent instruction for an answer to the question." (CT 258, 262) The reference to "the pertinent instruction" must have been the same as the reference to "the pertinent instruction(s)" in response to the previous question – i.e., to CALJIC Nos. 1.20 and 1.21. So, again, the judge's answer was erroneous, for the reasons just stated. A correct answer would have been that willfully to fail to act, a person must know

54

what act he is required to perform. (Garcia, supra, 25 Cal.4th at pp. 752, 754.) A more complete answer would have been that willfully to fail to act, a person must know what act he is required to perform, but it is not enough for a person to know what act he is required to perform and to fail to perform it, because willfully to fail to perform it he must also have a willingness or purpose not to perform it. (Id. at p. 752.)

At this point, the jury apparently despaired of obtaining a helpful answer from the judge and at 11:18 informed the bailiff that it was deadlocked. (CT 262; RT 236) In response, the judge and the attorneys discussed the last answer to the question. (CT 263) This discussion was reported. The judge proposed to voir dire the jury "in the customary way," but the prosecutor requested that he give the jury further instruction according to Garcia, which, since petitioner's attorney persisted in citing it, she had "looked at." (RT 236) Apparently for the first time, the judge also looked at Garcia ("I'd like to have the case that asks something about willfully"). (RT 240) The prosecutor referred to another case in which another judge faced a similar question and answered that "simply forgetting is not unwillful ...."[11] (RT 241) Petitioner's attorney requested that the court elaborate on

---

[11] This was a reference to People v. Barker, supra, 35 Cal.4th 345, in which the evidence was that the defendant did not "with a purpose or willingly" fail to register but was so busy with his duties as a house manager that he forgot to update his registration on his birthday. After permitting the defendant to present evidence and argument in support of this defense, when the jury asked if it were a defense,

55

its previous instructions by adding that "'willfully' imports a requirement that the person knows what he is doing", citing <u>Garcia</u>. (RT 242-243) The prosecutor argued that, under <u>Garcia</u>, the answer to the jury's question as to whether, "if a person failed to perform an act they know they must do, is that a willful act?" was "yes." (RT 243) She said that she thought it would be appropriate for the court to instruct the jury, in terms of <u>Garcia</u>, that "one cannot purposely fail to perform an act without knowing what act is required to be performed" and "the term willfully imports a requirement that the person knows what he's doing." (RT 244) The judge told the bailiff to tell the jury (in response to its message that it was deadlocked) that it should stand by for a further response to its last question and then deliberate further. (RT 245) The prosecutor asked for a re-phrasing of the language of <u>Garcia</u>. (RT 245-246) That request was left unresolved and, even though there was no agreement on the judge's further response to the jury's question, the judge said, "let the record show that plaintiff and defendant have agreed to the wording of the court's further response to the most recent question of the jury." (RT 247; see CT 263) At 11:44 a.m., the judge sent the jury a handwritten note, stating

> The word "willfully" implies a purpose or willingness to make the omission. One cannot purposefully fail to perform an act without knowing what act is required to be performed. The word "willfully"

---

the court informed it that it was not.

56

imports a requirement that the person know what he is doing.

(CT 259, 263)

Petitioner could hardly argue that this response was incorrect, since it scans the language of Garcia, supra, at p. 752. But it was incomplete and did not answer the jury's question, because it informed the jury that. for an omission to be willful, it must be knowing but did not inform it whether, if it was knowing, it was willful. Thus the jury resumed its deliberations and, after lunch, at 1:50 p.m., asked another question. (CT 260, 263)

The new question was a refinement of the last, "Is knowing what act is required to be performed sufficient to prove that the failure of the act was willful?" (CT 260) There was an unreported discussion of the question between 2:21 and 2:31. At the conclusion of the discussion, also off the record, the court stated the "wording to be used in the answer and defense objections to that answer as worded." (CT 263) At 2:32, the court responded to the question by a handwritten note. (CT 260, 263) The response was a deadlock-buster, because 11 minutes later, at 2:43, the bailiff informed the clerk that the jury had a verdict. (CT 263) The answer to the question was: **"If a person knows what act is required to be performed when he fails to perform such act, a failure to perform such act is willful."** (CT 260)

57

The answer violated petitioner's rights under the United States Constitution to due process and a jury trial because it directed a verdict as to the "willfulness" element – i.e., directed the jury that, if it found knowledge, that was sufficient for a finding of willfulness. It was a misunderstanding and distortion of <u>Garcia</u>'s holding that willfulness presumes knowledge. It turned that holding around and erroneously informed the jury that knowledge entails willfulness.

It is fairly obvious that the jurors believed that petitioner knew his duty to register (or may have believed, based on the instructions discussed in **Claim 3** below, that "knowledge" was not an issue), but at least some of them doubted that he intended not to register and believed that he had unconsciously or unintentionally failed to do so, while others may have believed that, if he knew about the duty and failed to perform it, then, *ipso facto*, his failure was willful. This latter position did not allow for the possibility of a negligent failure to register. It is not clear how some of the jurors could have got the idea that the failure was unconscious or unintentional or negligent, since they never heard the evidence about petitioner's intellectual limitations and bad memory, but it could have been based on the evidence which indicated that he had faithfully registered numerous times in the past and had no reason *not* to register while living at The Armory.

There was a logical mistake in the court's answer to the jury's instruction.

58

It consisted of confusing "necessary" and "sufficient" conditions. As applied to the present case, "knowledge" is a *necessary* condition for "willfulness." A failure to register cannot be willful unless the person has knowledge of the duty to register. So the California Supreme Court held in People v. Garcia, supra. But "knowledge" is not a *sufficient* condition for "willfulness." It does not follow from the fact that a person's failure to register cannot be willful unless he has knowledge of the duty to register that the failure of a person who has knowledge of the duty to perform that duty is willful. The existence of knowledge of the duty does not entail the existence of willfulness in failing to perform it.

That, however, was exactly what the judge in this case told the jury – that if petitioner knew that he had a duty to register, then his failure to register was willful. The judge did not simply tell the jury that knowledge was *necessary* for willfulness or that from the evidence that petitioner had knowledge it could infer that his omission was willful, but he informed the jury that knowledge is *sufficient* for willfulness -- that if a person knows that he is required to register when he fails to register, then his failure *is* willful. (CT 260) Since the jury had determined that petitioner knew his duty (or that "knowledge" was not an issue), that instruction, in effect, directed a verdict as to the willfulness element.

The instruction also operated as a mandatory presumption – i.e., a presumption which "tells the trier of fact that it *must* assume the existence of the

59

ultimate, elemental fact from proof of specific, designated basic facts ..." (People v. Roder (1983) 33 Cal.3d 491, 498) – in this case, that it *must* assume the existence of willfulness from the proof of knowledge. A conclusive mandatory presumption "removes the presumed element from the case once the State has proved the predicate facts giving rise to the presumption." (Francis v. Franklin (1985) 471 U.S. 307, 314, fn. 2.) A mandatory presumption "limits the jury's freedom independently to assess all of the prosecution's evidence in order to determine whether the facts of the particular case establish guilt beyond a reasonable doubt." (Roder, supra, at p. 498.) A finding of guilt may not rest on a mandatory presumption unless "the basic fact proved *compels* the inference of guilt beyond a reasonable doubt." (Ibid., fn. 7.)

The error was not harmless beyond a reasonable doubt. As shown above, all the jury's questions indicated that at least some of the jurors had a doubt about whether petitioner's failure to register was willful, but some jurors seem to have been arguing that, if petitioner knew that he had the duty to register, then his failure must have been willful. At one point it announced that it was deadlocked. Then the judge gave a more elaborate answer, tracking the language of Garcia. (CT 259) But the jury still did not reach a verdict and continued to deliberate. Finally, they framed the question in terms of whether knowing the duty was "sufficient" to prove willfulness, and the judge answered that it was. (CT 260)

60

Within minutes it returned a guilty verdict. Clearly, the judge's erroneous direction that, if the jury found knowledge, then it must find willfulness is what caused the jury to find petitioner guilty.

The Court of Appeal held that the trial court did not erroneously instruct the jury "If a person knows what act is required to be performed when he fails to perform such act, a failure to perform such act is willful." The court based this holding on the sentence in <u>People v. Garcia, supra</u>, at p. 752, that "Although notice alone does not satisfy the willfulness requirement, a jury may infer from proof of notice that the defendant did have actual knowledge, which *would* satisfy the requirement." (Exhibit A, p. 17.)

This holding misunderstood the significance of that sentence. The California Supreme Court was addressing the Attorney General's argument that "knowledge" was not an element of violation of section 290 and that the due process requirements laid down by <u>Lambert v. California</u> (1957) 355 U.S. 225 could be met by mere "notice" of the provisions of section 290. The court rejected that argument and explained that evidence of notice was relevant, and from it a jury could infer knowledge, but that, in order to find willfulness, the jury had to find actual knowledge. By saying that knowledge would satisfy the willfulness requirement, the court meant only that it would satisfy the knowledge *component* of the willfulness element. This is a far cry from finding that knowledge *is*

61

willfulness or that willfulness *necessarily* follows from knowledge.  But that is what the trial court's instruction informed the jury – i.e., that all it had to find was that petitioner had knowledge of the duty and his failure to comply with it must have been willful.

62

**Claim 3**: **PETITIONER'S RIGHTS UNDER THE UNITED STATES CONSTITUTION TO DUE PROCESS, TO PRESENT A DEFENSE, AND TO A JURY TRIAL WERE VIOLATED BY THE COURT'S INSTRUCTIONS TO THE EFFECT THAT "IGNORANCE OF THE LAW IS NOT AN EXCUSE."**

---

The trial court instructed the jury that "actual knowledge" of the registration requirement was an element of the offense.[12]  However, it contradicted that instruction by giving three instructions which stated or implied that he could be guilty of willfully failing to register, even if he did not know that he was required to do so, CALJIC Nos. 1.20, 1.21, and 3.30.

**No. 1.20**.  The California Supreme Court held in People v. Garcia, supra, 25 Cal.4th 744, 753-753, that No. 1.20 is correct, insofar as it requires "a purpose or willingness to act," but incomplete insofar as it fails to require actual knowledge of the registration requirement.  Of course, it was more than "incomplete" in stating that "willfully" does not require an intent to violate the law.

---

[12] However, it failed to instruct that, to be guilty of willfully failing to register at the homeless shelter, petitioner had to "know" that he was required to register at his *residence* (in spite of evidence that he was informed that he was required to register at his "domicile") *and that the homeless shelter was his residence*.  (See People v. LeCorno (2003) 109 Cal.App.4th 1058 [court erred in failing to instruct that defendant had to know *that he had a residence* in San Mateo, where he spent a few nights a week with friends, when he was not staying in his own apartment in San Francisco].)

63

**No. 1.21** was erroneous in a 290 case in that it purported to define "knowledge" in these terms: "The word 'knowingly' means with knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required." Knowledge of the unlawfulness of an omission *is* required. As Garcia succinctly put it, "In the registration act context, the jury must find actual knowledge of the act's legal requirements." (25 Cal.4th at p. 754.) This instruction, to which the court later referred the jury during its deliberations (CT 257), was dead wrong and flatly contradictory to the instruction which defined the elements of section 290. Petitioner had to have actual knowledge of his duty to register, which means that he had to know the unlawfulness of failing to register.

**No. 3.30**. Next, the court erroneously instructed the jury in terms of CALJIC No. 3.30 to the effect that "ignorance of the law is no excuse":

> In the crime charged, namely violating section 290(g)(2) of the Penal Code, there must exist a union or joint operation of act or conduct and general criminal intent. General intent does not require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful.

> (RT 225; CT 178)

The California Supreme Court held in People v. Barker, supra, 34 Cal.4th

64

345, that it is error to instruct according to CALJIC No. 3.30 in a 290 case, because the jury may incorrectly understand it to mean that "a defendant may be guilty of violating section 290 even if unaware of his or her obligation to register."

The effect of the three erroneous "ignorance of the law is no excuse" instructions was to *contradict* the one instruction that "knowledge" is an element. It thus tended to remove that element from the jury's consideration. (See People v. Edgar, supra, 104 Cal.App.4th 210, 221 [instruction that acquiring an additional residence constituted a change of residence "entirely removed from the jury the issue whether petitioner *had knowledge* that acquiring an additional residence required an additional registration'.) Some jurors may have found that petitioner did have knowledge (hence the jury's question as to whether, if a person has knowledge of a duty and fails to perform it, his failure is willful) but other jurors may have understood the instructions to mean that they did not have to find "knowledge" at all.

The giving of contradictory instructions as to the element of a criminal offense is constitutional error which invokes the "harmless beyond a reasonable doubt" test of prejudicial error. (California v. Roy (1996) 519 U.S. 2, 5-6; People v. Flood (1998) 18 Cal.4th 470, 502-503.)

65

**Claim 4: THE SENTENCE OF 25 YEARS TO LIFE WAS CRUEL AND UNUSUAL AND DISPROPORTIONATE PUNISHMENT, FORBIDDEN BY THE UNITED STATES CONSTITUTION.**

In <u>People v. Cluff</u> (2001) 87 Cal.App.4th 991, 1004, Division Three of the First Appellate District reversed the defendant's 25-to-life sentence for failing to update his registration because of the trial court's "abuse of discretion" in refusing to strike prior "strike" convictions for unsupported reasons but indicated that the sentence appeared to be "disproportionate by any measure." The court observed: "While there is no requirement that a third strike be a serious or violent felony," the Legislature and the voters did not "intend ... the Strikes law to be used as a nuisance statute to rid society forever of persons who fail to meet technical requirements ... of the registration law." (<u>Ibid.</u>)

In <u>People v. Carmony</u> (2005) 127 Cal.App.4th 1066,1084, 1089, the Third District held that punishment under the Three Strikes law was cruel and unusual punishment, in violation of the United States and California Constitutions, because of the minor nature of the offense.[13] In that case, the defendant registered on

---

[13] In <u>People v. Carmony</u>, No. C038802 (not pub'd), 03 WL 657703, the Court of Appeal held that the trial court abused its discretion in not striking the defendant's prior "strikes." In <u>People v. Carmony</u> (2004) 33 Cal.4th 367, 378-379, 380, fn. 6, the California Supreme Court reversed that decision on the grounds that (1) a number of factors showed that the defendant was within the spirit of the Three Strikes law and (2) the Court of Appeal erred in considering *only* the factor that the

66

September 16, 1999 (after being released from prison), and re-registered on September 23, 1999 (after moving to a new residence), but failed to "update" his registration within 5 days of October 22, 1999 (his birth date), which would have "served no stated or rational purpose of the registration law and posed no danger or harm to anyone" because he had no new information to add to the registration of one month earlier. (Id., p. 1073.)

In both <u>Cluff</u> and <u>Carmony,</u> the courts considered it significant that there was nothing about the defendants' failure to register which "demonstrate[d] recidivist tendencies toward [the sex offenses as a result of which the defendant was required to register]." (<u>Cluff, supra,</u> at p. 1004; <u>Carmony, supra,</u> at pp. 1080, 1088.) The offense in the present case may not be as trivial or technical as the offenses in those two cases, but petitioner showed no signs of recidivism.

According to <u>Ewing v. California</u> (2003) 538 U.S. 11, 123 S.Ct. 1179, 1189, the method of determining whether the punishment is grossly disproportionate to the offense is to compare "the gravity of the offense to the harshness of the penalty." The punishment of a minimum of 25 years and a maximum of life is

---

offense was minor, but the court reserved the question of whether the sentence might be unconstitutionally cruel and unusual punishment. In a concurring opinion, Justice Moreno, joined by Justice Chin, stated: "[s]ubject to the caveat that the sentence may yet be overturned on constitutional grounds, I reluctantly concur in the majority opinion." (Id., p. 381 [concurring opn.].) On remand, the Court of Appeal held as stated above.

67

grossly disproportionate to the gravity of the offense. All violations of section 290 were misdemeanors until January 1, 1995. Violations by registrants who were required to register because of a prior felony sex offense were then made felonies. (Subd. (g)(2).) The only reason given by the sponsor of the bill for elevating those violations from misdemeanors to felonies was that the registration system was not working well because prosecutors were not prosecuting violations, and that the way to motivate them to do so was to elevate them to felonies.[14] (See Assem. Com. on Public Safety, Analysis of Assem. Bill No. 3513 (1993-1994 Reg. Sess.) Par. 5, 1994, p. 4.) No suggestion was made that it was necessary, in order to motivate prosecutors, not just to elevate the violations to felonies but also to make them subject to sentencing for 25 years to life under the Three Strikes Law.

Such a sentence is grossly disproportionate to the crime because it is greatly in excess of any legitimate purpose it was designed to serve.

---

[14] One bill which originated in the Assembly and which elevated some violations of section 290 to felonies specifically provided that the "Three Strikes" law would not apply to it, and the bill passed the Assembly in that form. The bill was amended in the Senate and then, when it returned to the Assembly for concurrence in those amendments, it was pointed out that another bill, AB 1211, which had already been enrolled, did not contain that proviso, *and for this non-reason the proviso was deleted from the final Assembly version!* (See http://info.sen.ca.gov/ pub/93-94/bill/asm/ab_3501-3550/ab_3513_cfa_940830_233750_asm_floor )

68

## **CONCLUSION**

For all the foregoing reasons, the Petition for Writ of Habeas Corpus should

be granted, and the judgment of the California court should be vacated

Dated: January 14, 2008        Respectfully submitted,


*Richard Singh*

*for* VANCE RIDER

69

**EXHIBIT A**



Filed 6/28/06 Opinion on remand from Supreme Court

RECEIVED

JUN 29 200_

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

_T DISTRICT APPELLATE__

COPY

California Rules of Court, rule 977(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 977(b). This opinion has not been certified for publication or ordered published for purposes of rule 977.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIRST APPELLATE DISTRICT

### DIVISION FOUR

FILED
Court of Appeal First Appellate District

JUN 28 2006

Diana Herbert, Clerk
By_____Deputy Clerk

THE PEOPLE,

    Plaintiff and Respondent,

v.

VANCE LARCELL RIDER,

    Defendant and Appellant.

A097996

(San Mateo County
Super. Ct. No. SC047362)

## PROCEDURAL POSTURE

In *People v. Rider* (Sept. 17, 2003, A097996 [nonpub. opn.] (*Rider I*)), we affirmed defendant's conviction of failing to register as a convicted sex offender as required by Penal Code section 290 (hereafter section 290). The opinion was authored by then Presiding Justice Kay, with Justices Reardon and Sepulveda concurring. On December 23, 2003, review was granted by our Supreme Court pending consideration of a related issue. (*People v. Rider*, S120014.) On September 28, 2005, the matter was transferred to this Court with directions to vacate our decision in *Rider I* and to reconsider the cause in light of *People v. Barker* (2004) 35 Cal.4th 345 and *People v. Sorden* (2005) 36 Cal.4th 65.

In *People v. Rider* (Dec. 9, 2005, A097996 [nonpub. opn.] (*Rider II*)), after reconsidering the cause, we again affirmed. Between *Rider I* and *Rider II*, Justice Kay retired and Judge Munter of the San Francisco Superior Court was assigned to assist this Division by the Chief Justice pursuant to article VI, section 6 of the California Constitution. Judge Munter replaced Justice Kay on the panel and authored the opinion

**EXHIBIT A**

in *Rider II*, with Justices Reardon and Sepulveda concurring. On March 29, 2006, review was granted and the cause transferred to this Court with directions to vacate our decision in *Rider II* and issue a decision that considers whether the opinion after remand was issued by a properly constituted panel. (S140474.)

Justice Kay has been assigned by the Chief Justice to assist on this case. The present panel, therefore, is the same as the original panel which decided *Rider I*.    #3
Accordingly, whether the replacement of Justice Kay with Judge Munter in *Rider II* resulted in an improper panel is now moot. Having held oral argument, we proceed to the merits of the appeal.

## BACKGROUND[1]

The pertinent circumstances are easily recounted and largely without dispute.

Defendant stipulated that he "has been previously convicted of a felony sexual offense that requires him to register as a sex offender, pursuant to Penal Code section    #1
290." People's exhibit No. 6—which was admitted in evidence and a copy of which is in the record on appeal—consists of a number of defendant's registrations with various law enforcement agencies dating from 1994. On several of the forms for change of address defendant put down "transient" for his new address. The last registration from defendant was in January of 1999, giving an address in Oakland. In March of 2000, police discovered defendant in a National Guard armory in San Mateo, which was used as a shelter for the homeless. Only allowed to stay in the armory at nights, defendant had begun sleeping there in November of 1999.

The forms comprising People's exhibit No. 6 show defendant's birthday as January 4. The January 1999 registration contains defendant's certification under penalty of perjury as follows: "I have been notified of my duty to register as a convicted sex    #1
offender under PC §290 .... I have read, understood, and initialed each requirement listed below: [¶] ... [¶] Upon coming into, or when changing my residence or location within, any city, county, or city and county in which I am residing or located, I must

---

[1] The "Background" and "Review," *post*, are substantially the same as that    #3
contained in *Rider II*.

**EXHIBIT A**

register with the law enforcement agency having jurisdiction over my residence or location . . . as a sex offender, within five (5) working days. [¶] . . . [¶] Every year within five (5) working days of my birthday, I must update my address, name, and vehicle information with the registering agency."

One of the two officers who met defendant at the armory testified that a radio check returned the information that defendant "may not be in compliance" with his registration requirements. When asked when he had last registered, defendant replied "[O]n my birthday" in "January of 1999." Defendant told the officer he had last registered in Oakland, but he was "no longer living there." When asked for the card all sex offender registrants are required to carry,[2] defendant told the officers it had been mailed to his mother's house; upon checking his wallet defendant produced an expired registration card. Records of the Oakland Police Department showed that defendant had not registered in that city since January of 1999. The San Mateo Police Department had no record of defendant registering between November of 1999 and March of 2000.

Defendant did not testify or call witnesses on his behalf. At the start of trial he indicated that he would call Dr. William Lynch to testify for him. The prosecution asked for an offer of proof in order to establish the scope of Lynch's testimony "because issues related to mental defect, mental illness . . . under Penal Code Section 28, are not admissible. There are very significant confines on how that sort of testimony can be used in cases such as this, a general intent crime, and I believe [defense counsel] may be trying to use a psychologist to introduce evidence that is not admissible pursuant to Penal Code Section 28 . . . ." Defense counsel responded: "I've given [the] people a 13-page report which indicates my client's I.Q., his memory problems, and brain damage. That's what I would have Dr. Lynch testify about. It goes to whether there was a willful violation of Penal Code section 290. [¶] The California Supreme Court's most recent case of Garcia [*People v. Garcia* (2001) 25 Cal.4th 744] states the word 'willfully' implies purpose . . .

---

2 During his closing argument the prosecutor described the card as follows: "[O]n the back of this card are the sex registration requirements, within five days of moving into the city, five days of your birthday. There it is in black and white . . . . [D]efendant is carrying this with him on a daily basis."

**EXHIBIT A**

and a person's intention, I think their ability for memory and recall, and brain damage that they have suffered, can go directly to that issue."

At the hearing conducted pursuant to Evidence Code section 402 at the prosecution's request, psychologist Dr. William Lynch testified that he is chief of the brain injury rehabilitation unit at a Veterans Administration hospital.  He examined defendant and determined that he has an I.Q. of 69, "which is designated extremely low, . . . the lowest rating of an I.Q. score. . . . [¶] . . . his score was lower than 98 percent of the population."  For a person with such a score "there will be difficulty with memory, planning, problem-solving, the kinds of things that generally require more sophisticated brain functioning and overall intellectual sophistication.  A person can carry on their everyday life, but what they tend not to do is project very far into the future in terms of planning, they tend not to anticipate multiple consequences of their actions . . . ."  Such a person can follow simple instructions "if . . . stated very clearly" and remember dates "if the date is extremely significant, possibly, but I think there's a tendency to be casual about the specificity of dates and to possibly confuse them, because one of the problems you have as the I.Q. score dips that low is in keeping things in proper sequence as you may remember some details but you might remember them out of the actual order."  The passage of time would result in "loss . . . or distortion" of an instruction to do some act in the future.  Lynch tested defendant's memory and found it to be "on the same scale," that is "he tended to lose information over time."

On cross-examination, Dr. Lynch testified that defendant had no trouble recalling his birthday, but was not otherwise "a good historian" of events in his life.  Asked about the registration requirements recited on the forms in People's exhibit No. 6, Dr. Lynch testified that defendant could follow such instructions "If the information was given to him in writing, somebody sat down with him, went over it, under the circumstance[s] of that, but I think an instruction that's given to him once and verbally would be at great risk of being forgotten or distorted or misunderstood, based on what I found."

**EXHIBIT A**

After hearing argument from the parties, the court granted the prosecution's "motion in limine to exclude the testimony of Dr. Lynch" because "it appears that his testimony relates to an alleged mental defect," a subject prohibited by section 28.   # 1

At the close of the prosecution's case-in-chief, defendant's counsel asked the court to reconsider its ruling precluding Dr. Lynch from testifying. The court declined to change its ruling. The defense rested without calling any witnesses or presenting any evidence.   # 1

The jury was instructed on section 290 as follows: "In the crime charged in this case, namely, a violation of Section 290(g)(2) of the Penal Code, there must exist a union or joint operation of act or conduct and general criminal intent. General intent doesn't require an intent to violate the law. When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful. [¶] Every person who's required to register as a sex offender based on a felony conviction shall, for the rest of his life, register with the chief of police in the city in which he resides, within five working days of coming into that city. A registrant is also required to register annually within five days of his birthday. A willful failure to register is a violation of Penal Code section 290(g)(2). [¶] . . . [¶] In order to prove the crime of violating Section 290(g)(2) of the Penal Code, each of the following elements must be proved: one, the defendant was required to register as a sex offender pursuant to Penal Code Section 290 due to a prior felony conviction for a sexual offense; two, the defendant had actual knowledge of his duty to register; three, the defendant was residing in the City of San Mateo; four, the defendant willfully failed to register with the San Mateo Police Department within five working days of moving into San Mateo; or willfully failed to register with the San Mateo Police Department within five working days of his birthday."   # 1

The jury was also instructed with CALJIC Nos. 1.20 and 1.21 which defined "willfully" and "knowingly" as follows: "The word 'willfully' when applied to the intent with which an act is done or omitted means with a purpose or willingness to commit the act or to make the omission in question. The word 'willfully' does not require any intent   # 1

**EXHIBIT A**

to violate the law, or to injure another, or to acquire any advantage." "The word 'knowingly' means with knowledge of the existence of the facts in question. Knowledge of the unlawfulness of any act or omission is not required. A requirement of knowledge does not mean that the act must be done with any specific intent."

After less than two hours of deliberations, the jury requested written copies of the instructions. Less than an hour later, the jury requested "can we get a clearer definition" of the word "intentionally"; the court responded that "I am unable to do so." About 90 minutes later the jury requested—and received—a "read back" of the testimony by the officer who arrested defendant. Deliberations were adjourned for the day about an hour later. The following day, after about an hour of deliberating, the jury sent the court a note asking "Can a person do something willfully but not consciously?" After consulting with counsel in an unreported discussion, the trial court replied: "The question cannot be answered in that context, but I do invite your attention to the definition of 'willfully' in the pertinent instruction and, if it aids you, to the definition of 'knowingly' in that pertinent instruction."

Less than an hour later the jury asked "If a person fails to perform an act they know they must do, is that a willful act?" The court replied: "Again, you must use the pertinent instruction for an answer to the question." It appears that after 20 minutes, the jury advised that it was deadlocked. After consulting with counsel, the court then sent the following to the jury: "In further response to the attached question, please be advised as follows: [¶] The word 'willfully' implies a purpose or willingness to make the omission. One cannot purposefully fail to perform an act without knowing what act is required to be performed. The word 'willfully' imports a requirement that the person know what he is doing."

Approximately three hours later (following the noon recess), and still on the second day of deliberations, the jury asked the court "Is knowing what act is required to be performed sufficient to prove that the failure of the act was willful?" Over objection by the defense that this answer was covered by the court's most recent response, the court told the jury that "If a person knows what act is required to be performed when he fails to

**EXHIBIT A**

perform such act, a failure to perform such act is willful."  Approximately 10 minutes later the jury determined that defendant was guilty.

The next day the issue of defendant's priors was tried by the court.  The court found that, for purposes of the so-called three strikes law, defendant had prior felony convictions for oral copulation, attempted manslaughter, and three robberies.  In light of these findings, defendant was sentenced to state prison for a term of 25 years to life.

Defendant filed a timely notice of appeal.

### REVIEW

As a convicted sex offender, defendant was required by section 290 "for the rest of his . . . life while residing in, or . . . while located within California . . . to register with the chief of police of the city in which he . . . is residing, or . . . located . . . within five working days of coming into, or changing his . . . residence or location within, any city, county, or city and county . . . ."  (§ 290, subd. (a)(1)(A).)  "Beginning on his . . . first birthday following registration or change of address, the person shall be required to register annually, within five working days of his . . . birthday, to update his . . . registration with the entities described in subparagraph (A)."  (*Id.*, subd. (a)(1)(D).)  The precise provision defendant was convicted of violating specifies that "any person who is required to register under this section based on a felony conviction . . . who willfully violates any requirement of this section . . . is guilty of a felony . . . ."  (*Id.*, subd. (g)(2).)

*People v. Garcia, supra,* 25 Cal.4th 744, was the subject of much discussion below and in the briefs on this appeal.  The issue in *Garcia* was the correctness of instructions, which did not tell the jury that a willful failure to register required a finding that the defendant actually knew that he was obligated to register.  The Attorney General argued that the actual notice of the registration requirement given to the defendant by parole authorities when he was released from prison, was sufficient, and actual knowledge was not an element of the offense.  The Supreme Court disagreed:  "In a case like this, involving a *failure* to act, we believe section 290 requires the defendant to actually know of the duty to act. . . .  [A] sex offender is guilty of a felony only if he 'willfully violates' the registration or notification provisions of section 290.  [Citations.]

7

**EXHIBIT A**

The word 'willfully' implies a 'purpose of willingness' to make the omission. [Citation.] Logically one cannot purposefully fail to perform an act without knowing what act is required to be performed. As stated in *People v. Honig* (1996) 48 Cal.App.4th 289, 334 . . . , 'the term "willfully" . . . imports a requirement that "the person knows what he is doing." [Citation.] Consistent with that requirement, and in appropriate cases, knowledge has been held to be a concomitant of willfulness. [Fn. omitted.]' Accordingly, a violation of section 290 requires actual knowledge of the duty to register." (*Garcia*, at pp. 751-752.) "In this case, the court instructed the jury (based on the definition in § 7) that 'The word "willfully" when applied to the intent with which an act is done or omitted means with a purpose or willingness . . . to make the omission in question. The word "willfully" does not require any intent to violate the law . . . .' (CALJIC No. 1.20.) Thus this instruction correctly requires a showing of purpose or willingness to act, or (as in this case) fail to act. But, as we have explained, the instruction was incomplete in failing clearly to require actual knowledge of the registration requirement." (*Garcia*, at pp. 753-754.)

Consistent with *Garcia*, the trial court here instructed the jury that defendant could not be convicted unless the jury determined that he "had actual knowledge of his duty to register." Defendant, however, argues that a number of evidentiary and instructional errors relating to the mental state required for a violation of section 290 were committed and require reversal.

## I

Defendant's primary contention is that the trial court committed prejudicial error of constitutional dimension when it excluded the proposed testimony of Dr. Lynch.

The basis for the trial court's ruling was that the testimony was not permitted by section 28, which provides in pertinent part: "(a) Evidence of mental disease, mental defect, or mental disorder shall not be admitted to show or negate the capacity to form any mental state, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused committed the act. Evidence of mental disease, mental defect, or mental disorder is admissible solely on the

**EXHIBIT A**

issue of whether or not the accused actually formed a required specific intent, premeditated, deliberated, or harbored malice aforethought, when a specific intent crime is charged. [¶] (b) As a matter of public policy there shall be no defense of diminished capacity, diminished responsibility, or irresistible impulse in a criminal action . . . ." Also relevant is section 29, which provides: "In the guilt phase of a criminal action, any expert testifying about a defendant's mental illness, mental disorder, or mental defect shall not testify as to whether the defendant had or did not have the required mental states, which include, but are not limited to, purpose, intent, knowledge, or malice aforethought, for the crimes charged. The question as to whether the defendant had or did not have the required mental states shall be decided by the trier of fact." In operation these statutes mean that "Expert opinion on whether a defendant had the capacity to form a mental state that is an element of a charged offense or actually did form such intent is not admissible at the guilt phase of a trial." (*People v. Coddington* (2000) 23 Cal.4th 529, 582.)

Although the matter is not completely free from doubt, we cannot conclude that the trial court erred in treating Dr. Lynch's proposed testimony as proscribed by section 28. A proper appreciation of the context establishes that the subject of Dr. Lynch's testimony was defendant's "capacity to form any mental state," specifically "knowledge" within the meaning of section 28. Dr. Lynch did not ask defendant about why he did not register; when asked by the prosecutor, "Did you talk with the defendant at all about his obligations to register as a sex offender?" Dr. Lynch replied, "No." Lynch tested defendant for his "overall intellectual ability." Dr. Lynch testified about the "parameter or functioning" possessed by persons with defendant's I.Q., with particular attention to their ability to remember what they have been told. He concluded that defendant's memory "was consistent I think with what you would have predicted from the I.Q. tests." He did, however, discover that defendant had no hesitation in remembering the date of his birth. There is no evidence that Dr. Lynch questioned defendant about why he did not register in either Alameda or San Mateo Counties for the 15-month period between January 1999 and March 2000, and no indication that defendant himself raised the issue.

**EXHIBIT A**

In other words, there was no evidence that defendant had in fact failed to register for more than a year due to his impaired memory functioning. It thus appears that the general subject of Dr. Lynch's testimony was, in the abstract, the memory *capacity* of persons with I.Q.'s comparable to defendant. The testimony was consequently within the prohibitions against "[e]vidence . . . to . . . negate the capacity to form any mental state, including . . . knowledge" (§ 28, subd. (a)) by an expert (§ 29)).

Although defendant views the ruling as denying him his right under the United States Constitution to present a defense, our Supreme Court has concluded otherwise: "Sections 28 and 29 do not preclude offering as a defense the absence of a mental state that is an element of a charged offense or presenting evidence in support of that defense. #1 They preclude only expert opinion that the element was not present." (*People v. Coddington, supra,* 23 Cal.4th 529, 583.) These statutes did not preclude defendant from testifying himself, nor presenting corroborating testimony by nonexperts, detailing any previous incidents of forgetfulness, to attempt to establish that his failure to register was attributable to his inability to remember his obligation to register. That did not occur.

In *Barker,* our Supreme Court held that the willfulness element required for conviction under section 290 may not be negated by evidence the defendant "*just forgot*" to register. (*People v. Barker, supra,* 34 Cal.4th 345, 358.) At the same time, however, the court reserved deciding "whether forgetfulness resulting from, for example, an *acute psychological condition,* or *a chronic deficit of memory or intelligence* might negate the #2 willfulness required for a section 290 violation." (*Ibid.*) The issue in *Sorden* was whether the defendant's depression qualified for this exemption. The court held it did not: "[T]he willfulness element of the offense may be negated by evidence that an involuntary condition—physical or mental, temporary or permanent—deprived a defendant of actual knowledge of his or her duty to register." (*People v. Sorden, supra,* 36 Cal.4th 65, 69.) The court decided the issue very narrowly, holding that only exceptional situations would suffice: "Only the most disabling of conditions, we emphasize, would qualify under the standard we announce today. Severe Alzheimer's disease is one example that comes to mind; general amnesia induced by severe trauma is

**EXHIBIT A**

another. Defendant's claimed depression clearly did not satisfy this standard. Defendant knew of his obligation to register and, had he taken it to heart, he could have managed to discharge it." (*Ibid.*)

"Defendant did not proffer such evidence. There is no question but that he knew of his duty to register. He simply claimed his depression made it more difficult for him to remember to register. However, life is difficult for everyone. As a society, we have become increasingly aware of how many of our fellow citizens must cope with significant physical and mental disabilities. But cope they do, as best they can, for cope they must. So, too, must defendant and other sex offenders learn to cope by taking the necessary measures to remind themselves to discharge their legally mandated registration requirements. It is simply not enough for a defendant to assert a selective impairment that conveniently affects his memory as to registering, but otherwise leaves him largely functional. [¶] . . . [¶]

"Just as it would effectively eviscerate the statute to permit sex offenders to escape the consequences of failing to register on the ground they simply forgot to do so [citing *Barker*], so, too, would it effectively eviscerate the statute to countenance as an excuse a condition that falls short of nullifying knowledge of one's registration obligations . . . .

"Finally, defendant contends it was for a jury, not the trial judge, to decide whether his depression deprived him of actual knowledge of his duty to register. We disagree. The question whether a defendant has proffered evidence sufficiently substantial to go to the jury under the standard we announce today is a question confided to the sound discretion of the trial court." (*People v. Sorden, supra,* 36 Cal.4th 65, 72-73.)

In a supplemental brief, defendant contends he can satisfy the *Barker-Sorden* standard on the basis of Dr. Lynch's testimony and additional written materials that were before the trial court prior to the point at which it imposed sentence. The written materials are Dr. Lynch's written report and a report from psychologist G. Patrick Farrell concerning whether defendant was competent to stand trial.

11

**EXHIBIT A**

Granted, Dr. Lynch testified that defendant has an I.Q. of 69. But Dr. Farrell administered two tests, one of which fixed defendant's I.Q. at 94, the second at 74. Dr. Farrell also concluded that "Mr. Rider shows no signs of a disorder or any disturbance of thought such that mental illness would impair his ability to stand trial." **#2** Dr. Lynch's report includes multiple references to depression. There was no evidence defendant was ever institutionalized (not counting his prison commitments), and defendant told the probation officer he had lived on his own since 1974, when he was 16. In his written report, Dr. Lynch recorded that defendant had "mild neurocognitive impairment."

Dr. Lynch did not testify that defendant suffers from any organic disorder or physical cause resulting in a diminution of his ability to remember. Dr. Lynch did not testify that defendant is afflicted with a progressive or degenerative disease that makes **#2** him increasingly unable to recall. In fact, according to Dr. Lynch, defendant's memory is "actually pretty good" for some things. At best, Lynch testified, defendant has "difficulty with memory, planning, problem-solving, the kinds of things that generally require more sophisticated brain functioning and overall intellectual sophistication," but defendant has no problem remembering his birthday. Moreover, as Dr. Lynch conceded, "It's hard to argue with the fact that he abided by them [the registration requirements] up to a point."

This is the point that is virtually dispositive. People's Exhibit No. 6 shows that defendant was able to comply with the registrations requirements for a number of years. There is no evidence defendant personally claimed he did not know of his obligation to register. On the contrary, he knew of it and offered excuses to the probation officer: "I **#2** forgot to register on my birthday because I was probably drunk . . . . This is the first and only time I have failed to register." Defendant is therefore unable to claim that he suffers from a "*chronic deficit of memory or intelligence*." (*People v. Barker, supra*, 34 Cal.4th 345, 358.) He is not afflicted by an "an involuntary condition so disabling as to rob him of knowledge of his registration obligations under section 290." (*People v. Sorden, supra*, 36 Cal.4th 65, 72.) Whatever the precise nature of defendant's impairments, singly or collectively they do not meet the strict standard of "the most disabling of

**EXHIBIT A**

conditions." (*Id.* at p. 69.) "Defendant knew of his obligation to register and, had he taken it to heart, he could have managed to discharge it." (*Ibid.*)

Finally, we note that the issue of whether defendant's mental situation "deprived him of actual knowledge of his duty to register" was decided by the trial court. *Sorden* establishes that this procedure was not error. (*People v. Sorden*, *supra*, 36 Cal.4th 65, 73.) "The question whether a defendant has proffered evidence sufficiently substantial to go to the jury . . . is a question confided to the sound discretion of the trial court." (*Ibid.*) As did the court in *Sorden*, we find no abuse of discretion for the reasons given.[3]

## II

The court in *Garcia* also concluded that the trial court there "erred in giving an 'ignorance of the law is no excuse' instruction (CALJIC No. 4.36), which on its face would allow the jury to convict defendant of failing to register even if he were unaware of his obligation to do so. . . . In the registration act context, the jury must find actual knowledge of the act's legal requirements." (*People v. Garcia*, *supra*, 25 Cal.4th 744, 754.) The trial court did not give CALJIC No. 4.36, but it did give CALJIC No. 3.30, which told the jury that "When a person intentionally does that which the law declares to be a crime, he is acting with general criminal intent, even though he may not know that his act or conduct is unlawful." Defendant argues that CALJIC No. 3.30 is "a comparable 'ignorance of the law is no excuse' instruction" and subject to the same infirmities as the *Garcia* court found in CALJIC No. 4.36.

The comparison between CALJIC Nos. 3.30 and 4.56 was first drawn by Division Two of this Court in *People v. Edgar* (2002) 104 Cal.App.4th 210.[4] The court determined that the use of No. 3.30 constituted reversible error, but this conclusion was made in a far different context—unlike here, but like *Garcia*, the jury in *Edgar* had not

---

3 *Holmes v. South Carolina* (2006) ___ U.S. ___ [126 S.Ct. 1727], cited by defendant in a letter brief, does not alter this analysis or conclusion.

4 *Edgar* was discussed approvingly in *People v. Barker*, *supra*, 34 Cal.4th 345, 360-361.

**EXHIBIT A**

been instructed that the defendant must be found to have had actual knowledge of the registration requirements. (*Id.* at pp. 218-219.)

Defendant appears to read *Garcia* as standing for the proposition that the giving of either CALJIC No. 4.56, or by analogy, CALJIC No. 3.30 is a separate ground of instructional error. A close reading of *Garcia* and *Edgar* shows that both courts examined the issue of CALJIC No. 4.56 where the jury received no instruction on the requirement of actual knowledge of the registration requirements. There, the use of CALJIC Nos. 4.56 and 3.30 only aggravated that omission. In this case, however, the jury *was* instructed on the actual knowledge requirement. The correctness of the instructions given the jury is to be determined by examining all of the instructions, not just CALJIC No. 3.30. (E.g., *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248 and decisions cited.) It is clear from the instruction enumerating the requirements for conviction under section 290 that the jury was unambiguously told that they could not find defendant guilty unless they concluded that he "had actual knowledge of his duty to register." The use of CALJIC No. 3.30 therefore does not qualify as reversible error.

Defendant also claims that giving CALJIC No. 1.20 defining "willfully" was, without modification, sufficiently erroneous as to require reversal. While it is true that, as noted in *Garcia* and *Edgar*, CALJIC No. 1.20 does not, by itself, advise the jury of the actual knowledge requirement in failure-to-register prosecutions, here the jury was expressly instructed that defendant could not be convicted unless the jury found that he "had actual knowledge of his duty to register."

### III

Defendant contends that the trial court's instruction as to the "knowledge" element was inadequate in two ways.

He states the first in his brief as follows: "The court gave the jury one instruction as to both the offense of failing to 'register with the chief of police in the city in which he resides, within five working days of coming into that city' and the offense of failing to 'register annually, within 5 days of his birthday.' Here we are concerned with the first offense. The court also instructed the jury as to the meaning of 'residence'—that it

**EXHIBIT A**

'means a temporary or permanent dwelling place, which one keeps and to which one intends to return, as opposed to a place where one rests or shelters during a trip or transient visit.' The court instructed the jury as to the 'knowledge' element of the offense simply that it must be proved that 'The defendant had actual knowledge of his duty to register.' [¶] The court did not instruct the jury that it had to be proved that appellant knew that he had a duty to register within five days of coming into a city in which he resided or, more importantly, that it had to be proved that he knew that this duty arose upon his coming into a city *and acquiring a temporary or permanent dwelling place which he kept and to which he intended to return, as opposed to a place where he rested or sheltered during a trip or transient visit.* [¶] . . . Appellant cannot have willfully or purposefully have failed to register in San Mateo if he did not know that, legally, he was residing there." As to his second point, defendant contends that the jury was not told that he had to know that the annual update of his registration had to be done in San Mateo, not in Oakland.

Again, looking at the instructions as a whole, and how they would be reasonably construed by the jury (e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 963; *People v. Welch* (1999) 20 Cal.4th 701, 766), we discern no error. When the jury was told that conviction required that defendant had to have had "actual knowledge of his duty to register," that instruction would reasonably be construed as encompassing either his change of residence to San Mateo, his birthday in 2000, or both reasons giving rise to the "duty." "Residence" is not a technical term requiring definition. (See *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1216-1219.) There was no evidence that defendant was in effect maintaining dual residences in San Mateo and Oakland Counties. Moreover, because defendant did not register either in Oakland or in San Mateo, the issue is of no avail. (Cf. *People v. LeCorno* (2003) 109 Cal.App.4th 1058 [defendant had residence in San Francisco but often stayed at San Mateo work place].) It thus appears that the problems defendant now identifies are not intrinsic to the instructions, but assumed form only within the context of this case. Defendant is, therefore, challenging the instructions given as too general, incomplete, and lacking in clarity. That challenge has not been

**EXHIBIT A**

preserved for review because defendant did not request that the instructions be clarified. (E.g., *People v. Coddington, supra*, 23 Cal.4th 529, 603; *People v. Welch, supra*, at p. 757.)

### IV

Defendant discerns a number of difficulties with the trial court's responses to the inquiries sent out by the jury once it started deliberating.

As noted above, the court made four responses to inquiries from the jury. As to the first three, the record does not establish that defendant either objected to the court's responses or proposed different answers to the jury's questions. In these circumstances, the issue of the propriety of the court's first three responses has not been preserved for appeal. (E.g., *People v. Boyette* (2002) 29 Cal.4th 381, 430; *People v. Medina* (1990) 51 Cal.3d 870, 902.)

The court's fourth and final response requires different treatment. When the jury asked "Is knowing what act is required to be performed sufficient to prove that the failure of the act was willful?", the court met with counsel and discussed the situation, off the record. The reporter's transcript resumes with the court stating: "All right, on the record. Plaintiff proposes language, defendant has proposed language, the Court proposes to and will respond with the following answer, to wit, if a person knows what act is required when he fails to perform such act, and failure to perform such act is willful, defendant objects to that response." Defense counsel then explained his objection: "I believe the Court has already—the last question the jury asked rather was basically the same question. To this question, the Court responded with language that was directly out of *People v. Garcia* . . . . [¶] . . . I believe that that language was appropriate. I believe to go further and give you further answers to what is basically the same question is not appropriate."

According to defendant, "This response was error. It was a misunderstanding and distortion of *Garcia*'s holding that willfulness presumes knowledge. It turned that holding around and erroneously informed the jury that knowledge entails willfulness." As defendant reasons, the trial court was conflating the elements of knowledge and

**EXHIBIT A**

willfulness and in effect directing a verdict on willfulness. In the abstract, defendant's argument might seem to have merit. The actual language of *Garcia*, however, demonstrates that the trial court was not misreading the decision, but faithfully following it. In *Garcia*, our Supreme Court held: "A violation of section 290 requires actual knowledge of the duty to register. A jury may infer knowledge from notice, but notice alone does not necessarily satisfy the willfulness requirement. [¶] . . . Although notice alone does not satisfy the willfulness requirement, a jury may infer from proof of notice that the defendant did have actual knowledge, which *would* satisfy the requirement." (*People v. Garcia, supra*, 25 Cal.4th 744, 752.) This is precisely the import of the trial court's final response to the jury.

V

Defendant's final contention is that his sentence of 25 years to life constitutes cruel and unusual punishment prohibited by the United States Constitution. Since defendant filed his opening brief, the United States Supreme Court has found that California's three strikes law does not violate the Eighth Amendment, even when the latest offense is for a nonviolent, nonserious crime such as petty theft. (*Lockyer v. Andrade* (2003) 538 U.S. 63, *Ewing v. California* (2003) 538 U.S. 11.) Defendant makes much of the fact that a violation of section 290 was a misdemeanor until 1995, when the Legislature elevated it to a felony. Section 290, and laws like it, have been found not to violate ex post facto prohibitions. (*Wright v. Superior Court* (1997) 15 Cal.4th 521, 531-533; see *Smith v. Doe* (2003) 538 U.S. 84.) " 'The purpose of section 290 is to assure that persons convicted of the crimes enumerated therein shall be readily available for police surveillance at all times because the Legislature deemed them likely to commit similar offenses in the future. [Citation.]' " (*Wright v. Superior Court, supra*, at p. 527; accord, *McKune v. Lile* (2002) 536 U.S. 24, 32-34.) A violation of section 290 thus entails a substantial risk of future harm. Together with defendant's history of other serious and violent crimes, his sentence does not qualify as grossly disproportionate.

The judgment of conviction is affirmed.

**EXHIBIT A**

_____
Reardon, Acting P.J.

We concur:

_____
Sepulveda, J.

_____
Kay, J.*

_____

*People v. Rider*, A097996

_____

    * Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**EXHIBIT A**

**EXHIBIT B**

Court of Appeal, First Appellate District, Div. 4 - No. A097996
**S145664**

RECEIVED

OCT 19 2006

FIRST DISTRICT APPELLATE PROJECT

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

THE PEOPLE, Plaintiff and Respondent,

v.

VANCE LARCELL RIDER, Defendant and Appellant.

SUPREME COURT
**FILED**

OCT 18 2006

Frederick K. Ohlrich Clerk

DEPUTY

Petition for review DENIED.

George, C. J., and Baxter, J., were absent and did not participate.

**WERDEGAR**

Acting Chief Justice

**EXHIBIT B**

**EXHIBIT C**

**William J. Lynch, Ph.D.**
Licensed Psychologist - PSY #5151
*Diplomate in Clinical Neuropsychology, ABPP*
133 Arch Street - Suite 4
Redwood City, California 94062-1326
Telephone: (650) / 496-2562; 573-6402  FAX: 345-4593

9/30/00
## REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]

**NAME:** VANCE RIDER             **DATE TESTED:** 8/18/00
**AGE:** 42                       **REFERRED BY:** Thomas Deremigio, Esq.
**BIRTHDATE:** 1/4/58             **EXAMINER:** W.Lynch, Ph.D.


**Referral:** VANCE RIDER is a 42 year old, widowed, African-American male with 10+ years education. He is presently incarcerated in the San Mateo County Jail [SMCJ] charged with failing to register as a sex offender. He was jailed approximately 6 months ago. The present evaluation was requested in order to clarify his neurocognitive status.

**Summary of Materials Provided:** The following is a detailing of the materials provided by defense counsel for my review prior to completion of this report:
Review of records of Vance Rider

| Date: | Material: | Summary: |
|---|---|---|
| 21/21/98 | | |
| 7/14/00 | Letter from attorney Thomas Deremigio | Letter of verification engaging me as expert. |
| 4/18/00 | Report of examination by Dr. Harvey Small, psychiatrist | Dr. Small examined the defendant at the Maguire Jail Facility. Report of the arresting officer: The officer was called to the homeless shelter in San Mateo because a resident was making a disturbance. The officer found that the person in question was an adult Black male. Apparently the disturbance was not enough to cause arrest but a background check on the individual indicated that he was a sex offender who had failed to register on changing counties and had not registered since January of 1999. Mr. Rider did not show depression, agitation, anger, etc. but was pleasant and friendly. he made it clear from the start that his memory was poor and he had a Rolodex that he kept when he was "on the street" so that he would remember various things such as appointments and so forth. He has had a girlfriend who works with the carnival. He stated that in 1983 something happened which caused him to be arrested imprisoned for the next 11 years. He stated that he does not recall the episode but denied the idea that it may have involved violence. Apparently it was this episode which led him to be considered a sex offender. |

**EXHIBIT C**

REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]          Page 2
of VANCE RIDER                    Date of Testing: 8/18/00
by Dr. William Lynch

| | | |
|---|---|---|
| | | He was released from prison in 1994 but was back and forth in prison for the next few years until being released from parole in 1998. He has been required to register as a sex offender on a regular basis since that time. He could not explain why he failed to register when changing from Oakland to San Mateo County. He indicates that he has never been in a mental hospital and he does not consider himself to have had a mental illness. In 1998 he was depressed and contemplated suicide. The San Francisco health department referred him to a psychiatrist [Dr. Tom Ryan]. While in jail he has visited twice a month by a therapist [Alicia English]. He is currently taking 2 psychotropic medications: Mellaril and Sinequan.<br><br>He denies auditory or visual hallucinations.<br><br>He was thought to be a special child. He was considered to be a slow learner and was in classes for slow learners. He quit school at about the 10th grade at age 13 or 14 and has lived on the streets ever since. At age 17 he fell off a truck and sustained a head injury. He allegedly was in a coma for 6 days. He states that he does have a tendency towards violence although he feels he has outgrown it now as he has grown older. For example, when he was in prison he would have episodes of violence and would end up in solitary confinement. Conclusion: He has a personality disorder which may have been complicated by his head injury. However, he is mentally competent. He is able to understand the nature of criminal proceedings and to assist his attorney in a rational manner. |
| 12/21/98 | Records from San Francisco County Mental Health Center | Reasons for referral: "Client comes complaining of increased depressed mood and increased difficulty staying focused, "staring into space," forgetfulness, irritability with increased anger and frustration, difficulty sleeping (only 1 to 2 hours per night), some occasional suicidal ideation, and increased paranoid ideation with transient auditory hallucinations of an unspecified nature. He reports that there has been the death of his estranged wife and the death all the child would friend, and that the last straw came with the death of 2 man he had just met at the drop in center or shelter where he stays. He also reports having a benign skin tumor removed from his left leg which has left a gaping scar that is embarrassingly painful to him, all exacerbating his depression and leading to increased social avoidance or isolation. " Medications: Mellaril and Sinequan Psychiatric history: Was initially seen through a Sacramento public health clinic diagnosed as manic |

EXHIBIT C

# REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]
## of VANCE RIDER                                    Page 3
Date of Testing: 8/18/00
by Dr. William Lynch

depressive in 1981; stated he was violent and liked to fight all the time.

Suicide history: Had the idea to jump off a roof in 11/19/98.

Criminal Justice/Assault History: Was convicted of manslaughter in 1983; sentenced to 15 year term and was released from prison in April of 94. Completed parole in April of 98.

Substance Use History: Reports being clean from heroin for more than 15 years. He reports current use of marijuana twice per week but denies any alcohol use.

Medical history: Hypertension, strept throat, leg wound.

Current mental status: Attitude: Cooperative; appearance: Large African American male dressed in multiple layers of clothing with the backpack; movement: Slow and deliberate; speech: Slowed, speaking in a soft voice in short sentences with little elaboration; affect and mood: Affect blunted with some anger; mood was depressed and irritable; thought process and content: Thought process is logical with some paranoid ideation; thought content focused on losses and sense of pointlessness and hopelessness; transient suicidal ideation; reports occasional auditory hallucinations of unspecified sounds; insight and judgment: Both poor, depending on input from friends; memory and orientation: poor, and oriented times 3.

Diagnosis:
Axis 1:
296.34 Major Depression, Recurrent, Severe, With Psychotic Features
296.54 rule out Bipolar Affective Disorder, Severe, With Psychotic Features
Axis 2:
Diagnosis Deferred
Axis 3:
Benign Leg Tumor
Axis 4:
Primary support group, recent deaths
Axis 5: GAF scale: 39

Additional History:
He was born in Oakland California. He saw his mother trying to commit suicide "a few times." he was undisciplined, " out on his own on the street "at an early age, Was into gambling, drugs, and fighting. Spent time in juvenile justice system. Reports that "everyone thought I was two sandwich assure that the picnic basket. "

Adolescence: Went to high school in Daly City California; stopped going in the 11th grade, never got his GED. "I have a short attention span." Reports

**EXHIBIT C**

REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]          Page 4
of VANCE RIDER                    Date of Testing: 8/18/00
by Dr. William Lynch

---

having some contact with his sister who lives in southern California. "She's been religious lady." Also has had contact with a brother who is serving two life sentences for double homicide.

Adulthood: He married at the age of 26 to a woman he had known since adolescence. He was in jail at the time. He spent most of his adulthood in jail. His wife was living in Sacramento and had a stroke in 7/98. She died in 11/98 much to the client's surprise and dismay. He is having emotional difficulty with her death and wants to talk about it and to figure it out. Totally he has a lady friend that he feels close to and is able to talk with about his problems. "She's keeping me on track. I don't know what I do if she left."

Educational and Vocational History: He reports his jobs as "robbery and burglary." He states that he has never held a job for more than 30 days. He "always gets fired and never knows why."

Medical history: He reports smoking; experiences back and neck pain; he reports frequent migraine headaches; he has an eye infection; and had a benign tumor removed from his leg.

Problem Formulation/Clinical Impression: Client seems to be suffering from depression with possible psychotic symptoms exacerbated by homelessness and having no employment experience.

**Behavior And Symptom Identification Scale:** For ages 35 to 44, the results indicated quite a bit of difficulty in the area of depression and anxiety; moderate to quite a bit of difficulty in relations between self and others; moderate difficulties daily living skills.

His therapist indicates that he has extreme difficulty concentrating as well as staying on task; and that he has dissociative episodes that can sometimes last for more than an hour.

The remainder of the record it consists of handwritten progress notes dating from 12/98 through 3/2000.

---

**Self-Reported Historical Summary**: Mr. Rider was not a good historian, and expressed frequent uncertainty or forgetting re: historical events. Accordingly, the following information may not be completely accurate.

- Family Structure: Mr. Rider was born and raised in Oakland, CA. His mother is living, and is in her 60's; his father is deceased, apparently having died during the 1980's. He states that he was married, but that his wife died "in the 90's." [actually, November 1998 after a stroke in July of that year] When asked how many siblings he had, he indicated "around 10," and could not recall how many were males/females.

**EXHIBIT C**

**REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]**    Page 5
**of VANCE RIDER**            Date of Testing: 8/18/00
by Dr. William Lynch

---

- <u>Early Development</u>: He believes that he was a full-term baby, born without any obvious birth trauma or congenital abnormality. He feels that he was slow in developing walking skills. He reports having had a normal social life.

- <u>Schooling</u>: He completed 10 years of education [he quit school in the 11th grade], with poor grades [D's and F's]. He stated that he was told: "I went to a school for slow children." He thinks he may have had a learning disability. He said that his best/favorite subject is school was "gym;" while his worst/least favorite was English.

- <u>Work History</u>: He is unemployed, and is on welfare. He last worked [by his estimation] some 20 years ago.

- <u>Social Relationships</u>: He recalls having a normal number of friends during adolescence.

- <u>Military Experience</u>: none

- <u>Substance Usage</u>: *Alcohol*: He admits to having been a heavy drinker. He estimates drinking 2 – 5 times a week, and in amounts of "a fifth or more of Jack Daniels." *Drug*: He reports regular use of marijuana, but was unclear regarding other drugs. *Cigarettes*: He smoked 1 ppd of cigarettes "for 32 years."

- <u>Health History</u>: He gives his height as 6 ft-2in. and weight as 250 lb. He denies sleep problems or heart disease. He has had problems with high blood pressure, and takes medication to help control it. He thinks he may have stomach ulcers, but apparently this has not been diagnosed medically. He reports some low-back and neck pain. He is farsighted. He denies experiencing severe headaches or allergic reactions. **Medications**: He is taken medication for high blood pressure [he was incorrect in naming it "Benanzedril" – it is not likely to be ***Benadryl***] and depression / anxiety [doxepine – ***Sinequan***]. He had been taking ***Mellaril*** but is no longer.

- <u>Mental Health</u>: He has been treated for depression a number of times since his early 20's. He continues to see a therapist [Alicia English, Ph.D.] while incarcerated. He denied suicidal plans or attempts.

- <u>Neuropsychologic History</u>: He reported 3 incidents of closed head trauma:
    o   1968 [approx.] Hit by a truck, impact to back of head, unconscious for undetermined period.
    o   1975 [approx.] Fell, impact to top of head, unconscious for several days, posttraumatic amnesia [PTA] for 2 – 7 days.
    o   1979 [approx.] Hit on head with a bat, impact to posterior left of head, unconscious for "1 or 2 days," posttraumatic amnesia [PTA] unknown.

**EXHIBIT C**

REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]    Page 6
of VANCE RIDER    Date of Testing: 8/18/00
by Dr. William Lynch

---

No history of stroke, brain infection, or brain tumor.

**Tests Administered**: The following test were administered at the San Mateo County
Jail on **8/18/00** :

> Repeatable Battery for the Assessment of Neuropsychological Status [RBANS]
> Stroop Neuropsychological Screening Test [SNST]
> Test of Phonemic Fluency [F-A-S]
> Trail Making Test [TMT] Parts A & B
> Wechsler Adult Intelligence Scale-3rd Edition [WAIS-III]

**Test Behavior**: He appeared casually dressed in standard jail attire. His speech was
mildly abnormal with regard to production and clarity. No mannerisms, postures, or
other unusual behaviors were noted. No delusions, hallucinations, or Dissociative
episodes were detected. Overall level of motivation and effort was adequate, and thus
the results of testing are considered valid and accurately reflective of his actual
capacities and behavior.

**Test Results**: *Please see the appendix for a complete presentation of test scores*

A. Cognitive Functions:

1. **Mental Status**: His pattern of performance suggested normal arousal and alertness,
with problems in the areas of attention, and concentration.

2. **Intellectual Assessment**:   In order to assess an examinee's thought processes,
problem solving strategies, speed and accuracy of information processing, and verbal
fluency the Wechsler Adult Intelligence Scale-3rd edition [WAIS-III] was administered.

Based upon his demographic profile, his predicted intelligence should be in the Average
range [IQ 90 – 109]. His actual intelligence scores were as follows:

> Verbal IQ = 70 [Borderline]
> Performance IQ = 73 [Borderline]
> Full Scale IQ = 69 [Extremely Low]

His performance on the various composite or Index Scores was likewise below
expectancy:

> Verbal Comprehension Index = 72 [Borderline]
> Perceptual Organization Index = 76 [Borderline]
> Working Memory Index = 80 [Low Average]
> Processing Speed Index = 79 [Borderline]

**EXHIBIT C**

REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]          Page 7
of VANCE RIDER          Date of Testing: 8/18/00
by Dr. William Lynch

Summary of Intellectual Assets or Strengths: Since all but 2 of his performances were below the Average range [90 – 109], he did not demonstrate any absolute strengths. Relative to his general level of performance [Borderline], his most successful performances were noted on measures of:

- Auditory attention span, working memory, ability to concentrate, auditory sequence memory; resistance to distraction; Ability to hold complex information in mind, keeping new information properly organized.
- Accuracy of visual information processing; scanning; sustained attention; Ability to work under pressure. Ability to quickly evaluate visual stimuli; Ability to discriminate spatial features

Summary of Intellectual Liabilities or Weaknesses: Poorest performances were on the subtests measuring:

- Comprehension, verbal abstract reasoning, mental flexibility; fluidity of thinking, categorical thinking, ability to find salient bridging concepts between seemingly different words. An erratic performance is suggestive of higher potential or cognitive decline. Ability to generalize from one situation to another
- Speed of processing visual information, short-term visual memory, visual scanning, visual-motor dexterity, fine motor coordination; Clerical speed and accuracy. Degree of persistence in sticking with an unattractive task. Poor performance may be due to impaired visual motor coordination and/or visual acuity. Ability to follow directions.
- Basic math skills, attention span, problem solving, ability to withstand distraction; simple immediate recall; Ability to attend and concentrate on mental tasks.
- Fund of general information re: history, geography, and science accumulated through schooling, life experience, and intellectual curiosity. Ability to express ideas verbally; Ability to express ideas verbally. Range of interests.
- Attention to details, critical viewing, visual scanning, visual perception, visual acuity, visual alertness; Ability to discriminate what is important from what is nonessential and screen out what is not important, the ability to concentrate on and make sense of a visual image.
- Word knowledge, ease of expression, precision of knowledge, language development, academic potential. Relative richness of the examinee's thought processes and environment. Ability to recall word meanings previously learned.
- Non-verbal reasoning; visual organization, logical analysis, methodical problem solving without time pressure; visual alertness to detail. Ability to manipulate objects visually; to appreciate part-whole relationships.

**EXHIBIT C**

Summary of Intelligence Assessment: Mr. Rider's performance on the Wechsler Adult Intelligence Scale-3rd edition [WAIS-III] indicates a long-standing deficit in general intellectual ability. His overall level of intelligence is at the 2nd percentile for his age.

He evidences poorly developed verbal comprehension, processing, and expressive skills. He will likely have problems grasping complex verbal or written communications, and will not express himself clearly in speaking or writing.

His thinking tends to be simplistic, superficial, literal, and concrete. It is difficult for him to grasp the fundamental cause-and-effect relationships that underlie social traditions, conventions, and institutions.

3. **Neurocognitive Screening Assessment**: The Repeatable Battery for the Assessment of Neuropsychological Status [RBANS] is a screening evaluation which samples a wide range of neuropsychologic abilities including:
- Immediate Memory [List Learning; Story Memory]
- Visuospatial / Constructions [Figure Copy; Judgment of Line Orientation]
- Language [Picture Naming; Semantic Fluency]
- Attention [Digit Span; Coding: Symbol-Digit]
- Delayed Memory [Delayed Recall of List, Story, Figure; Recognition of List]
- **TOTAL SCALE** [a score representing overall level of performance]

Scores are evaluated with reference to age-weighted norms from ages 20-89. The overall performance levels obtained were as follows:

| INDEX | IMPAIRED | MARGINAL | NORMAL | ABOVE-AVERAGE |
|-------|----------|----------|--------|---------------|
| IMMED. MEMORY | X | | | |
| VIS-SPAT/CONST | | | | X |
| LANGUAGE | | X | | |
| ATTENTION | X | | | |
| DELAYED MEM | | | X | |
| **TOTAL SCALE** | | X | | |

The RBANS results indicate significant neurocognitive impairment, manifested primarily by deficits in verbal learning, fluency, and attention span. On the positive side, he performed quite well on measures of visual-spatial processing and retention.

**Additional Neuropsychologic Measures:**

Measures of Executive Functions:

The Stroop Neuropsychological Screening Test [SNST] requires the examinee to read the *color of the ink* that various color words are printed in, when the word and ink color are never matched; thus the word 'red' may be printed in blue, green or tan ink. To perform the task correctly, the examinee must consistently suppress the urge to read the word rather than to report the color of the ink it is printed in. The skill is a component of what have become known as 'Executive Functions,' and is felt to be dependent upon the integrity of the frontal lobes. His performance was consistent with the presence of

**EXHIBIT C**

**REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]**                    Page 9
**of VANCE RIDER**                    Date of Testing: 8/18/00
**by Dr. William Lynch**

---

brain dysfunction.
      The ability to switch between competing mental sets is often compromised in
brain disorders. The Trail Making Test - [TMT] consists of a simple [Part A] and complex
[Part B] segment. Part A requires the rapid connection of 25 circled numbers randomly
scattered on a page. Part B consists of circled numbers and letters [1 – 13; A – L] that
must be connected in *alternating* sequence [i.e. 1 – A – 2 – B – 3 – C etc...].
Successful performance requires mental flexibility, visual scanning, resistance to
distraction, and rapid visual processing. His performance was Within Normal Limits for
Part A and Mildly Impaired for Part B.

      Structured word production is another element of executive functions. This task
requires focused/sustained attention, word retrieval, and associative fluency. Mr. Rider's
performance was in the Low Average range [16th percentile] for his age and education.

      Summary of Neuropsychologic Assessment: Test results indicate mild
neurocognitive impairment. His major difficulties appear to be in the areas of
attention/concentration, verbal learning, verbal fluency, and abstract reasoning. The
pattern would be consistent with a long-standing [beginning in childhood] problem that
has been aggravated somewhat by subsequent mild Traumatic Brain Injury [TBI].
      His ability to recognize and discriminate spatial details and features of stimuli is
intact. On tasks requiring simple scanning of visual arrays, he performed fairly well.

==================================================================

**EXHIBIT C**

REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]        Page 10
of VANCE RIDER                              Date of Testing: 8/18/00
by Dr. William Lynch

---

## CONCLUSIONS

1. <u>Basic Cognitive Functions</u>: Mr. Rider's performance on the Wechsler Adult Intelligence Scale-3rd edition [WAIS-III] indicates a **long-standing deficit in general intellectual ability**. His overall level of intelligence is at the 2nd percentile for his age. He evidences poorly developed verbal comprehension, processing, and expressive skills. He will likely have problems grasping complex verbal or written communications, and will not express himself clearly in speaking or writing. His thinking tends to be simplistic, superficial, literal, and concrete. It is difficult for him to grasp the fundamental cause-and-effect relationships that underlie social traditions, conventions, and institutions.

2. <u>Extended Cognitive and Neuropsychologic Functions</u>: Test results indicate **mild neurocognitive impairment**. His major difficulties appear to be in the areas of attention/concentration, verbal learning, verbal fluency, and abstract reasoning. The pattern would be consistent with a long-standing [beginning in childhood] problem that has been aggravated somewhat by subsequent mild Traumatic Brain Injury [TBI]. His ability to recognize and discriminate spatial details and features of stimuli is intact. On tasks requiring simple scanning of visual arrays, he performed fairly well.

Predicted problems in everyday life would include:

- ❖ **Problems directing and sustaining attention on complex tasks**

- ❖ **Problems retaining details of what he has heard / been told**

- ❖ **Problems retrieving past information accurately in terms of what was learned, when it was learned, from whom he learned it, as well as in what temporal sequence events occurred.**

- ❖ **Problems organizing his thoughts**

- ❖ **Problems comprehending complex or lengthy messages or instructions**

- ❖ **Problems expressing himself clearly, in speech as well as writing**

- ❖ **Problems 'reading between the lines,' i.e. being able to go beyond the obvious or surface meanings of situations or communications. e.g. being able to read nuances, broader implications, or wider implications of what he experiences.**

**EXHIBIT C**

**REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]**          Page 11
**of VANCE RIDER**                    Date of Testing: 8/18/00
by Dr. William Lynch

3. <u>Diagnostic Impression</u>: [DSM-IV]

|          |         |                                                                      |
|----------|---------|----------------------------------------------------------------------|
| **Axis I:**  | 294.9   | Cognitive Disorder, NOS                                               |
|          | 311.    | Depressive Disorder, NOS [by history]                                |
| **Axis II:** | V62.89  | Borderline Intellectual Functioning [Verbal IQ = 70; Performance IQ = 73] or |
|          | 317     | Mild Mental Retardation [Full Scale IQ = 69]                         |
|          | 301.9   | Personality Disorder, NOS  with Schizotypal and Antisocial Features [by history] |

Thank you for referring Mr. Ryder. Please let me know if I can be of further assistance.

REPORT PREPARED BY:

William J. Lynch, Ph.D., Board Certified in
Clinical Neuropsychology, ABPP
Licensed Psychologist

**EXHIBIT C**

**REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]**     Page 12
**of VANCE RIDER**                    Date of Testing: 8/18/00
by Dr. William Lynch

## SUMMARY OF TEST SCORES

### INTELLIGENCE AND ACHIEVEMENT:
Wechsler Adult Intelligence Scale - third edition [WAIS-III]

| Measure: | IQ: | Level: |
|---|---|---|
| Verbal I.Q. | 70 | Borderline |
| Performance I.Q. | 73 | Borderline |
| Full Scale I.Q. | 69 | Extremely Low |

WAIS-III Subtests / Index Scores: [Values listed are I.Q. equivalents with a mean of 100 ±15, derived from age-weighted subtest scores]

| Measure: | I.Q. Equivalent: | Measure: | I.Q. Equivalent: |
|---|---|---|---|
| Vocabulary | 80 | Picture Completion | 75 |
| Similarities | 70 | Digit Symbol | 70 |
| Arithmetic | 75 | Block Design | 85 |
| Digit Span | 85 | Matrix Reasoning | 80 |
| Information | 75 | Picture Arrangement | *** |
| Comprehension | 65 | [Symbol Search] | 90 |
| [Letter-Num Seq] | 90 | [Object Assembly] | *** |

| WAIS – III INDEX SCORES: | IQE: | LEVEL: |
|---|---|---|
| Verbal Comprehension | 72 | Borderline |
| Perceptual Organization | 76 | Borderline |
| Working Memory | 80 | Low Average |
| Processing Speed | 79 | Borderline |

other test scores:

| MEASURE: | RAW SCORE: | IQE* | Level: |
|---|---|---|---|
| Trail Making Test-Part A | 38 secs-1 error | 85 | Low Average |
| Trail Making Test-Part B | 86 secs- 0 errors | 95 | Average |
| Test of Phonemic Fluency [F-A-S] | 30 words | 85 | Low Average |

*Heaton et al. norms [1991] adjusted for gender, age, and education

| MEASURE: | RAW SCORE: | %ile: | Probability of Brain Damage: |
|---|---|---|---|
| Stroop Neuropsychological Screening Test [SNST] | Color Task: 112-3 = 109 | | |
| | Color-Word Task: 65 – 4 = 61 | < 2 | > .98 |

**EXHIBIT C**

**REPORT OF INDEPENDENT MEDICAL EXAMINATION [IME]**          Page 13
**of VANCE RIDER**                    Date of Testing: 8/18/00
by Dr. William Lynch

## NEUROCOGNITIVE ASSESSMENT:

| TEST | IQE: | %ile | Level: |
|---|---|---|---|
| REPEATABLE BATTERY FOR THE ASSESSMENT OF NEUROPSYCHOLOGICAL STATUS [RBANS] | | | |
| **INDEX SCORES:** | | | |
| Immediate Memory | 81 | 10 | Marginal |
| Visuospatial / Constructional | 121 | 92 | Above Average |
| Language | 80 | 9 | Marginal |
| Attention | 72 | 3 | Impaired : |
| Delayed Memory | 98 | 45 | Normal |
| **TOTAL SCALE** | | | |
| **SUBTESTS:** | | | |
| 1. List Learning: | 81 | 10 | Marginal |
| 2. Story Memory: | 63 | 1 | Impaired |
| 3. Figure Copy: | 118 | 88 | Above Average |
| 4. Line Orientation: | 118 | 88 | Above Average |
| 5. Picture Naming: | 108 | 70 | Normal |
| 6. Semantic Fluency: | 71 | 3 | Impaired |
| 7. Digit Span: | 82 | 12 | Marginal |
| 8. Coding: | 74 | 4 | Impaired |
| 9. List Recall: | 90 | 25 | Normal |
| 10. List Recognition: | 83 | 13 | Marginal |
| 11. Story Recall: | 68 | 2 | Impaired |
| 12. Figure Recall: | 120 | 91 | Above Average |

**EXHIBIT C**

Vance RIDER v. Ben CURRY

**PROOF OF SERVICE BY MAIL**

I, RICHARD SUCH, say:

I am over the age of eighteen years, a citizen of the United States, and a resident of Santa Clara County, California. My business address is 1120 College Ave. (upper), Palo Alto, CA, 94306. On January 14, 2008, I served the within Petition for Writ of Habeas Corpus on the following persons by placing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at San Francisco, California, addressed as follows:

Attorney General
State of California
455 Golden Gate Ave. # 11000
San Francisco, CA 94102

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 14, 2008, at San Francisco, California.

RICHARD SUCH